Benjamin TRAPNELL, John Hogan
Interests, Inc. d/b/a First Foods
Company, Inc., et al. Appellants,

v.

SYSCO FOOD SERVICES, INC. and
Hoechst Celanese Corporation Special-
ty Chemicals Group f/k/a Virginia
Chemicals, Inc., et al. Appellees.

No. 13–91–367–CV.

Court of Appeals of Texas,
Corpus Christi.

Nov. 17, 1992.

Opinion Granting Motion for Rehearing,
Feb. 25, 1993.

Rehearing Overruled April 1, 1993.

Randell A. Kocurek, Brown, Sims, Wise & White, Houston, Russell Manning, Valerie Fogleman, Gary, Thomasson, Hall & Marks, Corpus Christi, for appellants.

J. Michael Myers, Ruth Greenfield Malinas, Ball & Weed, San Antonio, William J. Collins, III, Michael C. Falick, Benjamin Roeder, Kirkendall & Collins, Terriann Trostle, Stephen C. Dillard, William J. Boyce, Fulbright & Jaworski, Houston, Aldean E. Kainz, Small, Craig & Werkenthin, P.C., Austin, John A. Smith, III, Frank E. Weathered, Dunn, Cason & Weathered, V. Elizabeth Ledbetter, Redford, Wray & Woolsey, Roberta J. Hegland, Clay E. Coalson, Meredith, Donnell & Abernethy, Corpus Christi, for appellees.

Before GILBERTO HINOJOSA, KENNEDY and SEERDEN, JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

### INTRODUCTION

In this products liability death action, the plaintiffs, Benjamin Trapnell, Nicholas Trapnell, a minor, and Polly Ann Haugh,

seek reversal of consolidated summary judgments granted against them in the 94th District Court in Nueces County. The defendants are the manufacturers and distributors of sulfited foods which allegedly caused Susan Trapnell's death.[1]

The plaintiffs' petition alleges Susan Trapnell died from an allergic reaction to sulfites in foods she ate at the Corpus Christi Naval Air Station Officers' Club. The plaintiffs' theories of recovery included negligence, gross negligence, breach of warranty, strict liability, civil conspiracy, Deceptive Trade Practices, and loss of consortium. The defendants acquired summary judgments against the plaintiffs on several grounds including that the action was barred by collateral estoppel, the statute of limitations, the government contractor defense, and that the summary judgment evidence established as a matter of law that each product did not cause the death. We affirm in part and reverse and remand in part.

## I. FACTS

Susan Trapnell was a chronic asthmatic. She was allergic to sulfites, a food additive used as a preservative and processing aid. Her reaction to sulfites was manifested as an "asthma attack" or in severe cases, an "anaphylactic shock." Initially, she would feel tightness in her chest. This tightness would progress into difficulty breathing, similar to having an elastic band wrapped tightly around one's chest. As the tightness increased, her ability to draw a breath would become severely impaired.

This reaction could be reversed or rendered less severe by injections of epinephrine, a medication related to adrenaline, or other medication. Epinephrine could either be injected into a muscle or directly into the vein. These injections rapidly entered her system and relaxed her lung muscles which contracted during an asthma attack. On several occasions she had been hospitalized because of breathing problems.

Sulfites come in two forms, free sulfites and bound sulfites. When eaten by a sulfite sensitive person, free sulfites rapidly react in the mouth and stomach to form sulfur dioxide. While eating, varying amounts of sulfur dioxide are invariably inhaled. The sulfur dioxide reacts inside the lungs, causing rapid contraction of lung muscles and severe impairment of breathing ability.

Bound sulfites react more slowly after ingestion. When they reach the small intestine, bound sulfites enter the entire system, including parts of the lung which are not usually reached by inhalation of sulfur dioxide. The patient's reaction accordingly is systemic; less intense, but much more powerful and long-lasting than mere inhalation of sulfur dioxide into the upper portion of the lung.

After one particularly serious asthmatic episode, Susan Trapnell was referred to Dr. Ronald Simon, a recognized expert in diagnosis and testing of sulfite sensitive individuals. Dr. Simon tested Susan and discovered that she reacted strongly to a ten milligram capsule of potassium metabisulfite.[2] Her reaction to this dose was so strong that he opined that had he not been present to administer epinephrine and to help pull her through, her reaction would have been life-threatening.

He counseled her to avoid certain foods which were known to contain sulfites. When eating at restaurants, he directed her to ask whether preservatives contain-

1. Susan Trapnell was the wife of Benjamin Trapnell, the mother of Nicholas Trapnell, and the daughter of Polly Ann Haugh.

2. To determine whether a person was sensitive to sulfites Dr. Simon would "challenge" a subject with a ten milligram capsule of potassium metabisulfite or a placebo. If the subject repeatedly reacted to the sulfites, and not to the placebo, Dr. Simon would diagnose the subject as sensitive to sulfites.

It is difficult to measure a person's reaction to each type of sulfite because of difficulties in determining the proportions of bound sulfites to free sulfites in a capsule challenge. When the potassium metabisulfite capsule is ingested, much of it immediately reacts to form sulfur dioxide. This may or may not be inhaled and cause an immediate reaction in the lungs. Some of the remaining potassium metabisulfite is ingested through the stomach and is taken into the system. This sulfite reacts systemically, like bound sulfites.

ing sulfites were on the foods she wished to eat. At all times she carried an "epikit," containing a hypodermic syringe of epinephrine, to protect her against accidental sulfite ingestion.

On August 5, 1984, Susan, Benjamin, and Nicholas went to the Officer's Club at the Corpus Christi Naval Air Station to dine at the buffet. Benjamin asked one of the cooks present whether any sulfite products had been used in the preparation of the food. After the cook responded that no sulfites had been used, the Trapnells went through the buffet line. Susan allegedly served herself with fruit from the fresh fruit bowl, apple pie filling, hash browns, and other foods not suspected of containing sulfites.

Minutes after consuming some of these foods, Susan began to react strongly. Her husband asked her if they needed to go to the hospital, and she said yes. She made it as far as the lobby before collapsing. Benjamin immediately administered .5 cc of epinephrine intramuscularly from the epikit. EMS was summoned. Before they arrived seizures began. Her breathing difficulties increased. She vomited, blocking her throat. In the five to ten minute period before the ambulance arrived, Susan was unresponsive. She exhibited no breathing or pulse.

When the EMS arrived, they could not intubate her because of the vomit blocking her lungs. Susan was rushed to the Naval Air Station Hospital. She arrived with no pulse.

Heroic efforts in the emergency room lasting one hour and forty minutes brought Susan's blood pressure back, but nothing more. She was completely unresponsive to any stimuli including lights in her eyes and severe pain. Only a trace of brain activity on the EEG kept Susan from being declared brain dead at that time. This activity disappeared on August 9, four days after eating at the Officer's Club. She was pronounced brain dead on the 10th.

Three products on Susan's plate have been identified as containing sulfites: hash browns, apple pie filling, and potato white mixed with the fruit salad. Relatively small levels of bound sulfites possibly were present in the hash browns, and moderate levels possibly were present in the apple pie filling. However, potato white, which may have been used by the Officer's Club to preserve fresh fruit in the fruit bowl, was composed of free sulfites. An average serving of fruit preserved with potato white would contain a dose of sulfites which could easily overwhelm and kill a sulfite sensitive person such as Susan Trapnell.

It is disputed whether potato white was used on the fruit she ate. The cooks testified in deposition that they did not use potato white on the fruit. However, they also stated that they used potato white to preserve fruit salad if any was left over after a party. There was a party on the Base the night before Susan ate at the Officer's Club. Dr. Simon testified in a deposition that the speed and intensity of Susan Trapnell's reaction implicated potato white. The relatively low levels of sulfites in other products also implicated potato white. No direct evidence linked potato white to Susan Trapnell's death, but strong circumstantial evidence regarding the manner of her death raises the inference that free sulfites in the potato white was a cause.

The manufacturers and other parties in the chain of distribution are as follows:

*Potato White:*

Hoechst Celanese Corporation, Specialty Chemical Group (formerly known as Virginia Chemicals, Inc.), manufactured sodium metabisulfite and sold it to John Hogan Interests, d/b/a First Foods Company, Inc.

First Foods manufactured Potato White from the sodium metabisulfite it acquired from Hoechst Celanese and sold it to Nordhaus.

Nordhaus sold Potato White to Sysco Food Services, Inc. of Sysco Corporation.

Sysco sold Potato White to the Officers' Club.

*Apple Pie Filling:*

Allied Corporation manufactured sulfites and sold them to McKesson Chemical Company.

McKesson then sold sulfites to Zero Pack.

Zero Pack added sulfites to apples during processing and sold them to Globe.

Globe manufactured apple pie filling and sold it to Labatt Institutional Supply Company.

Labatt sold apple pie filling to the Officer's Club.

*Hash Browns:*

Allied manufactured and sold sulfites to Univar Corporation.

Univar sold the sulfites to Lamb–Weston, Inc.

Lamb–Weston manufactured hash browns and sold them to Sysco.

Sysco sold the hash browns to the Officer's Club.

These defendants will be grouped and referred to by product wherever possible.

## II. PROCEDURAL HISTORY

Suit was filed in State District Court on May 22, 1986, against Sysco, Labatt, and other defendants who are no longer parties.[3] The other parties were joined as discovery disclosed their involvement. Because of sovereign immunity, an action was filed against the Navy in United States District Court for the Southern District of Texas on December 22, 1986, under the Federal Tort Claims Act (FTCA). On March 30, 1989, the federal court, cognizant of the state action which was filed first, entered an order staying proceedings until the state action became final.

A priority trial setting was obtained in State District Court for October 16, 1989. The defendants, apparently recognizing certain advantages in trying the case in federal court, petitioned and received from the state court an order abating the state action so they could seek intervention in the federal action. This order was entered on June 16, 1989, after the federal court stayed proceedings.

The federal court denied intervention on September 26, 1989. It ruled that all defendants were not diverse parties and no independent basis for jurisdiction existed for the non-diverse party (Sysco). Thus, the federal court was faced with potential litigation of state claims (products liability) against new defendants, including Sysco, a non-diverse party. The federal court, relying upon *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), held that federal courts in an FTCA action do not have jurisdiction over pendent parties which do not have an independent basis of jurisdiction (in this case Sysco), and declined intervention of all other parties.

At this point, both the state and federal proceedings were stymied. The plaintiffs then filed a petition for writ of mandamus in this Court seeking relief from the State District Court's abatement. We resolved the impasse by ordering the State District Court to lift the abatement order. *Trapnell v. Hunter*, 785 S.W.2d 426, 429 (Tex. App.—Corpus Christi 1990, original proceeding) (*Trapnell* I). We held the abatement unconstitutional. However, as a result of the State District Court's abatement order, the plaintiffs lost their "number one" trial setting of October 16, 1989.

The trial court then granted summary judgment in favor of one defendant, John Hogan Interests, Inc. d/b/a First Foods Company. The motion for summary judgment alleged that First Foods's product, Potato White, did not cause Susan Trapnell's death. The summary judgment was appealed to this Court.

After this summary judgment was granted, the federal court then lifted its stay and rapidly proceeded to trial to the court on the plaintiffs' FTCA action against the Navy. It ruled that potato white was not added to the fruit bowl and that the Navy was not liable under other theories.

After the appeal in *Trapnell v. First Foods Co.*, 809 S.W.2d 606, 611 (Tex.App.—Corpus Christi 1991, writ denied) (*Trapnell* II), was perfected, but before submission,

---

**3.** These parties were dropped from the suit when it became apparent that their products

could not have caused Susan Trapnell's death.

First Foods filed a motion in this court to take judicial notice of the federal proceeding. It argued that the federal judgment collaterally estopped the plaintiffs from relitigating the causation issue decided against them in the federal action.

We declined to take judicial notice of the federal judgment because collateral estoppel was not raised as a ground in First Foods' motion for summary judgment. Thus, as a matter of law, it could not form a basis of that judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979); TEX.R.CIV.P. 166a(c).

We reversed the summary judgment on April 25, 1991, because the combined motion and response indicated that a fact question existed regarding causation. *Trapnell II*, 809 S.W.2d 606, 611.

While this case was under consideration by this Court, summary judgments were granted in favor of all other defendants on the grounds of collateral estoppel (for the potato white defendants as a result of the federal judgment), no causation, and other theories. Summary judgment was granted on Globe's motion on April 8, 1991, on Allied's motion on April 18, 1991, on Virginia's motion on April 26, 1991, and on the motions of Univar, Van Waters, and McKesson on May 13, 1991. Motions for rehearing were denied on May 15, 1991.

Appellants' six points of error complain that the trial court erred in granting the summary judgments against each defendant. These points are interrelated and will be discussed together.

## III. ANALYSIS

The summary judgment evidence shows that Susan Trapnell died from an allergic reaction to sulfites in one or more of three foods she ate at the Officer's Club.[4] Plaintiffs' suit alleges products liability and negligence causes of action against the manufacturers and distributors of these three products. Each defendant's defense is that its product did not cause her death, but that the others did so. Collectively, they

argue that, although all potentially responsible parties are present, each is not liable.

Despite the evidence linking Susan Trapnell's death to sulfite ingestion, the trial court granted summary judgment in favor of all defendants. It held that the summary judgment evidence proved as a matter of law that each product did not cause the injury. The court also granted summary judgment for the potato white defendants on the grounds of collateral estoppel and the government contractor defense. It granted summary judgment on limitations grounds for Univar, Van Waters, and McKesson against the adult plaintiffs.

We reverse all summary judgments except those based on limitations. Collateral estoppel does not apply. A question of fact exists regarding the comparative causation of each product defendant. We hold the government contractor defense was not proven.

### A. COLLATERAL ESTOPPEL

#### 1.

The federal court found as a necessary element of its judgment that the plaintiffs failed to prove that the Navy cooks placed potato white into the fruit bowl. Consequently, the Court held that the Navy did not cause Susan Trapnell's death. One of the principle issues in this appeal is whether defensive non-mutual collateral estoppel or issue preclusion bars relitigation of the causation issue between the manufacturers and distributors of potato white and the plaintiffs. We hold that relitigation is not barred because the cause of Susan Trapnell's death was not fully and fairly litigated in the federal proceeding, and also because applying collateral estoppel here would violate appellant's right to trial by jury as protected by the Texas Constitution.

Under the common law doctrine of collateral estoppel or issue preclusion, a party may be precluded from relitigating an issue if: "(1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; (2) those facts were

---

**4.** The experts from all sides agree on this point.

essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Eagle Properties v. Scharbauer*, 807 S.W.2d 714, 721 (Tex.1990); *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).[5] The policies underlying issue preclusion are to protect parties from multiple lawsuits, prevent inconsistent judgments, and conserve judicial resources. The doctrine is primarily designed to enhance judicial efficiency by preventing relitigation of issues already decided. *See Parklane*, 439 U.S. at 328, 99 S.Ct. at 650. However, where countervailing considerations outweigh judicial efficiency, collateral estoppel does not apply. *See Lytle v. Household Mfg. Inc.*, 494 U.S. 545, 553–54, 110 S.Ct. 1331, 1337, 108 L.Ed.2d 504 (1990) (concern about judicial economy is insufficient to circumvent the right to trial by jury).

The case law applying collateral estoppel distinguishes between mutual and non-mutual estoppel, and between offensive and defensive estoppel. At common law mutuality of estoppel was the general rule. Parties and privies, but no others, were bound by a judgment. *Bigelow v. Old Dominion Copper Co.*, 225 U.S. 111, 127, 32 S.Ct. 641, 642, 56 L.Ed. 1009 (1912). However, in *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971), the supreme court, in order to reduce needless relitigation, abandoned the mutuality requirement. It held that in cases in which a party has litigated and lost, the prior judgment could have collateral estoppel effect against the loser in a second litigation involving the loser and a new party. Such cases involve non-mutual estoppel.

A second distinction is drawn between offensive and defensive collateral estoppel. *Parklane Hosiery, Co.*, 439 U.S. at 329–30, 99 S.Ct. at 651. Defensive estoppel is implicated if a plaintiff litigates and loses, and seeks to relitigate against another defendant. Collateral estoppel in such cases is a defense. Offensive collateral estoppel arises if a defendant litigates and loses, and a plaintiff seeks in a subsequent litigation to bar relitigation of common facts against that defendant. Collateral estoppel in such a case is an offensive weapon, and not a shield. The instant case involves non-mutual defensive estoppel.[6]

In determining whether to apply collateral estoppel to a particular case, a court must analyze and balance certain factors to determine whether the prior litigation of the issue was both full and fair. *See Blonder–Tongue*, 402 U.S. at 333, 91 S.Ct. at 1445; *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 7 (Tex.1986). Generally, "a party should not be precluded unless his previous opportunity was at least the equivalent of that otherwise awaiting him in the present litigation." *Restatement (Second) of Judgments* § 29 *comment b.*

The *Restatement (Second) of Judgments* lists several pertinent factors. For example, preclusion does not apply if the second proceeding presents procedural opportunities which were different or non-existent than in the first. *Scurlock Oil*, 724 S.W.2d at 7; *Restatement (Second) of Judgments* § 29(2) and § 28(3). Issue preclusion does not apply if the burden of proof in the second proceeding is higher, or shifted, against the party asserting the bar. *Scurlock Oil Co.*, 724 S.W.2d at 7; *Restatement (Second) of Judgments* § 28(4); 18 Wright, Miller, Cooper, FEDERAL PRACTICE AND PRO-

**5.** It is an open question whether state or federal law applies; however, there is little difference between the two. In *Eagle Properties v. Scharbauer*, 807 S.W.2d 714, 721 (Tex.1990), the Court declined to address the choice of law question because the result was not different under either analysis. Similarly, the result in the instant case is not dependent upon which law applies. We, too, decline to address this issue.

**6.** One principle reason for the doctrine of non-mutual defensive collateral estoppel is to pre-

vent plaintiffs from relitigating an issue merely by "switching adversaries." *Parklane*, 439 U.S. at 329, 99 S.Ct. at 651. Theoretically, non-mutual defensive collateral estoppel results in more effective allocation of judicial resources than the rule of mutuality because it compels plaintiffs to join all defendants in the first case. This follows because non-joined defendants will not be bound by the results of the first case, but the plaintiffs will be bound.

CEDURE, § 4422 (1981). Issue preclusion does not apply if parties not present in the first litigation will be adversely affected by the bar. *Restatement (Second) of Judgments* § 29(6). A factor supporting preclusion is that the party against whom estoppel is urged could have joined the party asserting the bar. *Id.* § 29(3).

■ The first issue we address is whether the absence of certain procedures and opportunities distorted full and fair litigation of the causation issue in the federal proceeding. In the federal action, only the Navy and the plaintiffs were parties. The plaintiffs were required to prove by a preponderance of the evidence that potato white caused Susan Trapnell's death. The evidence showed that Susan Trapnell died from ingestion of sulfites, and that several foods suspected of containing sulfites, including fruit from the fruit bowl, were present on Susan Trapnell's plate. In contrast to the circumstantial evidence linking potato white to the death, the Navy cooks directly denied adding any potato white to the fruit.

The federal court reasoned in its ORDER denying recovery for appellants that:

The evidence showed many other possible sources of sulfites. Before coming to the buffet, she had drunk a small cup of grape juice as part of communion at church. Although Mr. Trapnell testified that it was not the sparkling grape juice known to contain sulfites, other fruit juices were suspected of containing sulfites. Of the foods she ate at the buffet, apple pie filling and hash browns often contained sulfites. The portion of hash browns she ate could have contained 8 mg. of sulfites and been within measured levels of hash browns then on the market.

The federal court apparently concluded that Susan Trapnell's death was caused by sulfite consumption, but the source was not potato white. It held for the Navy.

In the instant case, the summary judgment evidence implicates only three products as a cause of death. The manufacturers and distributors of these three products are joined. Direct evidence of Susan Trap-nell's allergies and manner of death strongly indicates that one or more of the joined defendants caused her death.

The federal action was different than the state action because the federal action involved the plaintiffs against only one defendant. It involved litigation of only one of many potential causes. The plaintiffs were required to prove by a preponderance of the evidence that the specific cause of death was only one product, potato white. The plaintiffs' case was circumstantial in nature, and the defense successfully argued that one of the many other sources of sulfites caused the death.

These differences are important because the difficulties of proof encountered by the plaintiffs in the first action are not present in the second. Specifically, the summary judgment evidence shows that Susan Trapnell died from an allergic reaction to sulfites and that the only sulfites she consumed must have been supplied by the defendants. If this is proven, one or more of these joined defendants caused her death. All defendants cannot successfully argue, as did the Navy, that some other party supplied the sulfites which caused her death. However, this result can easily occur in separate proceedings, even though the evidence shows that at least one defendant's product caused the death.

The question before us is whether this procedural disadvantage resulted in a lack of full and fair litigation of causation in the first case. *Scurlock Oil Co.* is the leading Texas case on this question.

In *Scurlock Oil Co.*, 724 S.W.2d at 7, two Missouri Pacific Railroad Company employees, Dove and Smithwick, were killed in an automobile accident by an oil truck driven by an employee of Scurlock Oil Company. Suit seeking recovery for Dove's death was filed in Matagorda County. Smithwick's heirs filed suit in Nueces County. The Dove heirs entered into a Mary Carter agreement with Scurlock and the Smithwick heirs did so with Missouri Pacific.

The Matagorda County suit went to trial first. The Mary Carter agreement be-

tween Dove and Scurlock was not admitted into evidence. The jury apportioned responsibility 90% to Missouri Pacific and 10% to Scurlock.

In the Nueces County suit the Scurlock/Dove Mary Carter agreement was improperly admitted as impeachment evidence. The Nueces County jury found Scurlock Oil Company 100% responsible. The trial court rendered judgment in favor of Smithwick for $4,165,557.00.

Scurlock appealed, claiming that the Matagorda County verdict had preclusive effect on the comparative causation issue. The issue before the Supreme Court of Texas was whether comparative causation was fully and fairly litigated in the prior trial. The Court reasoned that the collusion caused by such agreements may result in such prejudice to the non-settling defendant that preclusive effect is not warranted. The Court held that the existence of a Mary Carter agreement in the prior case could have prevented full and fair litigation of comparative causation in that case, and remanded the case to the trial court to weigh and consider whether collateral estoppel should apply.

The Court directed the trial court to "consider certain fairness factors" in making this determination. *Id.* at 7. Relying upon the *Restatement (Second) of Judgments* § 28(3) and § 28(4), the Court wrote that these factors include: 1) whether different procedures were available in the first case; and 2) whether a different standard or burden of proof applied. *Scurlock,* 724 S.W.2d at 7.

The facts in this case indicate even more strongly than *Scurlock Oil Co.,* the presence of different procedures in the prior action which could distort the fact-finder's findings on comparative causation. All parties were not present. The nature of this case required joinder of all product defendants to eliminate from the fact finder's consideration the possibility that another source of sulfites caused the death. Thus, the litigation was neither full nor fair.

Lack of joinder was a significant procedural difference between these two cases

which distorted the fact-finder's analysis of cause in fact. We conclude that the difference between the procedures applied in the federal action and those available in this case is a factor which strongly weighs against applying collateral estoppel here.

Another important procedural difference in these two proceedings is the difference in the burden of proof on the crucial causation issue. *See Scurlock Oil Co.,* 724 S.W.2d at 7; *see generally* FEDERAL PRACTICE AND PROCEDURE § 4422 (citing cases). Under current law, if a plaintiff establishes that one or all defendants caused the injury without proving which one, the burden shifts to each defendant to prove that he did not cause the injury. This rule applies here.

In *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948), the Supreme Court of California shifted the burden of proof to the defendants in a case involving two joined tortfeasors both of whom could have caused the injury, but the evidence does not establish which did so. In that case two hunters simultaneously discharged their shotguns while bird hunting. Both were using twelve gauge shotguns and 7½ shot bird loads. The plaintiff was in the line of fire. He was struck by two pellets, one in the eye and one in lip. The shot in the eye caused the most significant injury. Each defendant argued that a preponderance of the evidence did not establish that he fired the pellet striking the eye. The Court responded:

> When we consider the relative position of the parties and the results that would flow if plaintiff was required to pin the injury on one of the defendants only, a requirement that the burden of proof on that subject be shifted to both wrongdoers becomes manifest. They are both wrongdoers—both negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can. The injured party has been placed by defendants in the unfair position of pointing to which defendant caused the

harm. If one can escape the other may also and plaintiff is remediless.

*Summers,* 199 P.2d at 4.

The *Restatement (Second) of Torts* § 433B(3) reflects the ruling in *Summers.* It provides:

Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Similarly, in *Celotex v. Tate,* 797 S.W.2d 197, 204 (Tex.App.—Corpus Christi 1990, no writ), the plaintiff was repeatedly exposed to asbestos made by three companies for many years. As a result, he later developed mesothelioma. He joined all manufacturers in his suit. This Court, adopting the *Restatement (Second) of Torts* § 433B(2), held that the plaintiff met his burden of proof by presenting legally sufficient evidence that the manufacturer supplied some of the asbestos to which he was exposed, and that he was harmed by the asbestos. The burden then shifted to the manufacturer to apportion liability or suffer joint and several liability. *Restatement (Second) of Torts* § 433B(2) provides:

Where the tortious conduct of two or more actors has combined to bring harm to the plaintiff, and one or more actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

Section 433B of the *Restatement, Summers,* and *Tate* apply here because the plaintiffs sued all possible tortfeasors and pleaded that one or more of them caused Susan Trapnell's death. The summary judgment evidence showed she ingested one or more of the three products at the Officers' Club, causing her allergic reaction and resulting death. Thus, the burden shifted to each defendant to prove that it did not cause the injury or to apportion liability.

We recognize that the Supreme Court of Texas declined to adopt either *Summers* or § 433B in *Gaulding v. Celotex Corp.,* 772 S.W.2d 66, 69 (Tex.1989). However, the reason why *Gaulding* did not adopt these theories is because in that case all defendants had not been joined. Here all possible joint tortfeasors, or a party in privity with each of them, has been joined.[7]

Furthermore, the *Gaulding* Court did not hold that § 433B did not apply in Texas. The Court merely held that *Gaulding* was not an appropriate case to adopt such theories.

Like *Tate,* this is an appropriate case. The summary judgment evidence alleges that one or more of three products caused Susan Trapnell's death. At least one manufacturer or distributor is joined for each product. It is uncertain which product caused the death, and each defendant blames the others. As the *Gaulding* Court recognized, it is possible that in this case "traditional rules of causation would prevent recovery." *Id.* 797 S.W.2d at 205. Thus, traditional theory is defective because it could permit all tortfeasors in a limited and identified group of defendants to escape liability in a case where the evidence is clear that at least one caused the injury.

---

7. In anticipation of our ruling below affirming summary judgment against certain defendants on limitations grounds, appellees argue that these theories of tort liability do not apply because all defendants are not joined. This rule does not apply in the instant case.

The purpose of the rule requiring all defendants to be joined is to eliminate from the jury's consideration the theory that some other cause, besides a joined defendants' conduct, caused the injury. In products cases, all defendants in the marketing chain are in privity. Thus, where at least one defendant for each product is joined, a legally responsible party for each product, *i.e.,* each cause in fact of the injury, is present. This is all that is necessary. The possibility is eliminated from the jury's consideration that a cause, other than one represented in the action, was a factor in the injury.

In this case, at least one manufacturer or distributor representing each product has been joined. Thus, *Gaulding* is distinguishable because in that case all manufacturers of asbestos products which could have caused the injury were not joined.

If all defendants (or a party in privity with all defendants) are joined, justice is better served in such cases by shifting the burden of proof on causation and comparative causation to those who are implicated in causing the harm. Not only do they have better access to the evidence, but they, and not the innocent plaintiff, are at fault. Applying § 433B avoids "the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." *Restatement (Second) of Torts* § 433B *comment to subsection* (3).

Reason and justice compel us to reaffirm our adoption of § 433B in *Tate*. We hold that § 433B(2) and (3) apply in the instant case.

The decisions considering the effect of a favorable reduction or shift in the burden of proof in the second proceeding hold that collateral estoppel does not apply in such cases. *See One Lot Emerald Cut Stones v. United States*, 409 U.S. 232 (1972); *Scurlock Oil Co.*, 724 S.W.2d at 7; FEDERAL PRACTICE AND PROCEDURE § 4422 (citing cases). Section 433B shifts the burden to the defendants on the crucial issue of comparative causation. Accordingly, this factor strongly weighs against applying collateral estoppel.

Another factor we must consider in determining whether to apply collateral estoppel is whether the plaintiffs could have joined the potato white defendants in the prior federal action. If so, this is a factor which weighs in favor of precluding relitigation. *Restatement (Second) of Judgments* § 29(6).

The potato white defendants argue that the plaintiffs should have joined them in the federal action, thus the plaintiffs are collaterally estopped from relitigating any issue decided therein. But, as discussed earlier, the plaintiffs could not join Sysco in

the federal action as a matter of federal law. *See Finley*, 490 U.S. at 555, 109 S.Ct. at 2010. Thus, Sysco cannot argue that the plaintiffs should have joined them in the federal action. Moreover, except for two weeks before trial, the federal action was stayed. The other defendants cannot seriously contend that the plaintiffs should have joined them to the federal action while it was stayed. There is no summary judgment evidence showing that joinder of the other parties within the period between the time the stay was lifted and the date of trial was logistically possible or would have been granted by the federal court at that point in the litigation.

Additionally, the only reason why the federal action proceeded to trial first was because of the unconstitutional abatement order procured by the defendants, including Sysco. Preclusion, an equitable doctrine based on fairness, would be particularly unfair in light of the fact that Sysco's motion to intervene was clearly meritless under *Finley*. We decline to allow the potato white defendants to take advantage of their procedural gymnastics in this manner. *Restatement (Second) of Judgments* § 29(8) [8]; *see generally* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4426.

We disagree with the potato white defendants' argument that the plaintiffs could have and reasonably should have joined all defendants in the · first action. Section 29(3) of the *Restatement (Second) of Judgments* is not a factor which supports preclusion in this case.

Another factor important to our analysis is whether issue preclusion will complicate determination of the issues in this case and adversely affect other parties. *Restatement (Second) of Judgments* § 29(6). If collateral estoppel applied, it would preclude the plaintiffs from arguing that potato white was the cause. This would adversely effect the non-potato white defendants' posture because, under the current interpretation of contribution and indemni-

---

**8.** *Restatement (Second) of Judgments* § 29(8) provides that preclusion should not apply if:

Other compelling circumstances make it appropriate that the party be permitted to relitigate the issue.

ty law, they too would be precluded from arguing that potato white was a cause. *See Brown & Root, Inc. v. Rust Eng'r,* 679 S.W.2d 576, 578 (Tex.App.—Texarkana 1984, writ ref'd n.r.e.); *Nacogdoches County v. Fore,* 655 S.W.2d 347, 350 (Tex.App.—Tyler 1983, no writ) (a defendant may not assert a cause of action for contribution against another defendant against whom the plaintiff has no cause of action).

Furthermore, application of collateral estoppel in this manner raises due process concerns. In *Blonder–Tongue,* the supreme court held that the due process clause prohibits application of collateral estoppel against parties who were not present in the first litigation. *Blonder–Tongue,* 402 U.S. at 329, 91 S.Ct. at 650. By giving the federal judgment preclusive effect, we would be eliminating the non-potato white defendants' opportunity to prove that potato white was a cause. They will have been deprived of their day in court. This factor also weighs heavily against giving preclusive effect to the federal action. *Id; Restatement (Second) of Judgments* § 29(6).

An additional factor we must consider is whether the policy objectives collateral estoppel is designed to further will be obtained if it is applied here. The policy objectives identified by the Supreme Court in *Lytle* are: "Collateral estoppel protects parties from multiple lawsuits and the possibility of inconsistent decisions, and conserves judicial resources." *Id.,* 494 U.S. at 553, 110 S.Ct. at 1337. If these purposes do not support issue preclusion, it should not apply. *See Id.; Scurlock Oil Co.,* 724 S.W.2d at 7.

To determine whether the "judicial efficiency" rationale underlying collateral estoppel supports its application here, we must balance competing interests. *See Lytle,* 494 U.S. at 553, 110 S.Ct. at 1337; *Scurlock Oil Co.,* 724 S.W.2d at 7. Eliminating one set of defendants from the case would conserve judicial resources to a limited extent, but it would not terminate the litigation.

The costs of eliminating these defendants includes preventing the plaintiff from joining all product defendants and fully litigating the causation and comparative causation issues in one proceeding. It also includes creating the possibility of inconsistent decisions.

The plaintiffs are faced with potentially inconsistent judgments. If collateral estoppel precludes relitigation against the potato white defendants, in the second action the jury could find (as the federal court apparently did) that Susan Trapnell died from sulfite ingestion. It could also find that the apple pie filling and hash browns did not contain sulfites. All potentially liable defendants could then escape liability.[9] In this scenario, collateral estoppel guarantees injustice. No amount of judicial efficiency can justify this result. *See Lytle,* 494 U.S. at 553, 110 S.Ct. at 1337.

No defendant in the instant litigation was involved in the federal case. Thus, the policies of protecting these parties from multiple lawsuits and inconsistent decisions is not a reason for applying collateral estoppel.[10]

On balance, the marginal benefit of saving some judicial resources is far outweighed by the possibility of inconsistent decisions and the distorting effects it would have on the litigation. Protecting the defendants from multiple lawsuits and inconsistent decisions is not at issue. We con-

---

9. In fact, this has already occurred. The trial court held collateral estoppel barred relitigation of the question whether potato white caused the death. It also granted summary judgment in favor of the apple pie and hash brown defendants because of the evidence that these products did not cause the death. Even though the experts agree that only these three products contained sulfites and Susan Trapnell died from an allergic reaction to sulfites, paradoxically, all defendants are holding summary judgments in their favor.

10. Appellees argue that if collateral estoppel is not applied they may be faced with inconsistent decisions when they seek contribution against the Navy. This argument is illusory. The Navy will not be able to assert defensive non-mutual collateral estoppel against such defendants without violating well established due process principles. *See Blonder–Tongue,* 402 U.S. at 329, 91 S.Ct. at 1443.

clude that the policy objectives of collateral estoppel would not be furthered by its application here.

We conclude collateral estoppel does not apply. Joinder of Sysco and other defendants, a particularly important procedural advantage in this case, is available in the State proceeding. This procedure was not available in the federal action. As a result of having all defendants present in one action in State District Court, the burden of proof on causation and comparative causation, the crucial issue, will be shifted from the plaintiffs to the defendants. Preclusion, a doctrine based on fairness, is unfair in this case because of the manner in which it was procured, and because it would prejudice the other defendants who are seeking contribution from the potato white defendants. No policy objectives of collateral estoppel will be served by its application here. Consequently, we hold collateral estoppel is not applicable to the instant case.

### 2.

The next issue we address is one of first impression for Texas Courts. The question is whether a party's rights under the Texas Constitution are violated if preclusive effect is given to facts found by a court in a prior case in which the party had no right to a trial by jury. If collateral estoppel is applied in this manner, no jury, state or federal, will ever have an opportunity to decide the disputed fact questions involved in this case.

The prior federal trial involved here was to the court. It involved the plaintiffs against the Navy. There was no right to trial by jury because, the United States, as a limited waiver of its right to sovereign immunity, granted the plaintiffs the right to sue it on the condition that the suit be tried before a federal judge. 28 U.S.C.A. § 2402 (1992); *see United States v. Sherwood*, 312 U.S. 584, 586–88, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941). Appellee's argument is that the federal judge's findings in the first case should not be given preclusive effect in the second action because this would circumvent their state constitutional right to present the disposi-

tive fact question in this case to a jury. We agree.

*Parklane Hoisery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), addressed the issue of whether facts found by a federal judge in a prior equitable action could preclude a party to that action from relitigating such facts before a federal jury. The United States Supreme Court held that the Seventh Amendment to the United States Constitution was not violated by precluding the parties from relitigating the issue.

In *Parklane*, the Securities and Exchange Commission (SEC) sued corporate defendants in federal court alleging that a proxy statement was materially false and misleading. Based on affirmative findings made by the trial court, injunctive relief was granted in favor of the SEC after a trial to the court. Federal law, which makes a distinction between legal and equitable actions, did not provide for a right to a jury trial in the injunction hearing.

Stockholders filed a class action against Parklane Hoisery alleging they suffered damages caused by the same proxy statements. They sought to apply non-mutual offensive collateral estoppel to preclude the corporate defendants from relitigating the issue of whether the statements were materially false and misleading in the same respects as found by the federal court.

The corporation argued that the Seventh Amendment protects the right to trial by jury as it existed at common law. At common law non-mutual collateral estoppel was not permitted. Thus, at common law a jury would have been empaneled to hear this case. Consequently, the corporation argued that the stockholders, who were not parties to the first proceeding, could not assert collateral estoppel against them in the second proceeding because there would have been a right to trial by jury at common law.

The stockholders argued that at common law the findings of a judge were binding in a subsequent proceeding. Hence, they argued that such findings should have preclusive effect now. The Supreme Court agreed with the stockholders, and held that

issue preclusion did not violate the corporation's Seventh Amendment rights.

The potato white appellees argue that the law in Texas provides collateral estoppel effect to facts found by a federal judge. *Eagle Properties*, 807 S.W.2d at 721–25; *Baker v. Storey*, 564 S.W.2d 166, 170 (Tex. Civ.App.—San Antonio 1978, no writ). Citing *Parklane* and *Eagle Properties*, appellees insist we must hold that no jury trial right is implicated here. We disagree.

*Eagle Properties* is distinguishable. In that case a partnership made notes in connection with a sale and leaseback of bank property. The bank was declared insolvent and the Federal Deposit Insurance Corporation (FDIC) was appointed the bank's receiver. The FDIC accelerated the notes and sued in federal court. *FDIC v. Eagle Properties, Ltd.*, 664 F.Supp. 1027 (W.D.Tex.1985). The defendants filed counterclaims and defenses based on fraud, DTPA, and other allegations. The federal court, sitting without a jury, found no fraud. The Supreme Court of Texas held that these findings collaterally estopped the defendants from relitigating the fraud issue later in the state court.

The jury trial issue was not addressed by the Supreme Court of Texas in *Eagle Properties*. Like other issues, alleged errors based on constitutional grounds are waived in the Supreme Court of Texas if not properly preserved. *Johnson v. Lynaugh*, 796 S.W.2d 705, 707 (Tex.1990). Thus, *Eagle Properties* is not precedent for the proposition that facts found by a federal judge always have collateral estoppel effect in Texas Courts, even if it results in the denial of a party's right to trial by jury under the Texas Constitution.[11]

*Parklane*, too, is distinguishable. The issue in this case is whether application of collateral estoppel here offends the Texas Constitution, not whether it violates the United States Constitution.

The Seventh Amendment preserves the right to a jury trial as it existed in 1791. *Parklane*, 439 U.S. at 333, 99 S.Ct. at 652. It provides:

> In suits at common law, where the value of the controversy shall exceed twenty dollars, the right to a jury trial shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of common law.

U.S. Const. 7th Amend. At common law there was no right to trial by jury in equity. Facts found in federal court during a prior equitable proceeding had preclusive effect in a subsequent legal proceeding. *Parklane*, 439 U.S. at 333, 99 S.Ct. at 652. In construing this provision, the Supreme Court in *Parklane* reasoned that if fact-findings by a judge sitting in equity had preclusive effect at common law, then such findings must have preclusive effect today.

Our analysis on this point is significantly guided by the recent decision of *Davenport v. Garcia*, 834 S.W.2d 4 (Tex.1992). This decision illustrates the proper context to view *Parklane:* "With a strongly independent state judiciary, Texas should borrow from **well reasoned and persuasive** federal procedural and substantive precedent when this is **deemed helpful**, but should never feel compelled to parrot the federal judiciary." *Davenport*, 834 S.W.2d at 19 (emphasis added). Rather than parrot *Parklane* as proposed by the potato white defendants, we will conduct an analysis of what the framers' of our State Constitution intended.

Two provisions in the Texas Constitution protect our right to trial by jury, TEX. CONST. art. V § 10 and art. I § 15. In *White v. White*, 108 Tex. 570, 196 S.W. 508, 511 (1917), the Supreme Court of Texas wrote that article I § 15 should be con-

---

**11.** It is possible that the right to trial by jury was waived in the federal action in the *Eagle Properties* litigation. In *FDIC v. Eagle Properties, Ltd.*, 664 F.Supp. 1027 (W.D.Tex.1985), there is no explanation as to why there was no trial by jury. *See generally* the discussion on waiver *infra*. Other decisions involving the

FDIC's attempts to recover debts on behalf of this bank involved jury trials. *See FDIC v. Castle*, 781 F.2d 1101, 1103 (5th Cir.1986). We, however, refuse to speculate on whether a jury trial was waived by the parties in the federal proceeding.

strued pursuant to article I § 29, which provides:

> To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

TEX. CONST. art. I § 29. This provision was discussed in *Travelers' Ins. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007, 1010–11 (1934). In that case the Supreme Court of Texas decided that the contract clause in the Texas Constitution could not be overridden by legislative enactment based on police power. The Court relied upon art. I § 29 in upholding the contract clause.

Our analysis begins with the relevant constitutional text. In contrast to the Seventh Amendment, Article 1, § 15 of the Texas Constitution provides in part:

> RIGHT OF TRIAL BY JURY. The right of trial by jury shall remain inviolate. The legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency.

Article V § 10 of the Texas Constitution provides:

> TRIAL BY JURY. In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury; but no jury shall be empaneled in any civil case unless demanded by a party to a case, and a jury fee paid by the party demanding a jury, for such sum, and with such exceptions as may be prescribed by the legislature.

TEX. CONST. ART. V § 10.[12]

Article I § 15 guarantees the right to a jury if such right existed at common law. *White*, 196 S.W. at 512. Compared to the federal system, at common law Texans enjoyed a broader right to a jury trial. For example, as far back as the 1845 Texas Constitution, Texas citizens were then and are now entitled to have a jury find facts in equitable causes.[13] *See* TEX. CONST. OF 1845 art. IV § 16.

■ The right to a jury trial reserved to the people in art. V. § 10 is significantly broader than that granted in the Seventh Amendment. It affords this right in all "causes" in a Texas District Court, regardless of whether the cause existed at common law. *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 292 (Tex.1975); *Walsh v. Spencer*, 275 S.W.2d 220, 223 (Tex.App.—San Antonio 1954, no writ). The scope of this provision has turned upon interpretation of what is, or is not, a constitutional "cause." The effect is to guarantee the right to a jury in such constitutional causes.

In *Tolle v. Tolle*, 101 Tex. 33, 104 S.W. 1049 (1907), the Supreme Court of Texas wrote that a constitutional "cause" included "a suit or action. Any question civil or criminal contested before a court of justice." *Id.* 104 S.W. at 1050; *see also Credit Bureau*, 530 S.W.2d at 292. Finding that a probate proceeding was a constitutional "cause," the court held that a right to a jury trial existed because there was a fact issue presented. The holding was based on art. V § 10.

■ Laws which diminish the right to a jury trial are unconstitutional. For example, in *San Jacinto Oil Co. v. Culberson*, 100 Tex. 462, 101 S.W. 197, 198–99 (1907), the trial court appointed a master in chancery who made findings. The statute which provided for the appointment of a master stated that: "the master shall have such powers as a master of chancery has in a court of equity."[14] *Id.* 101 S.W. at 199.

---

**12.** No other constitution in the United States has two constitutional provisions protecting the right to trial by jury in a civil case. Braden, The Constitution of the State of Texas: An Annotated and Comparative Analysis, vol. 1, 421 (1977).

**13.** The right to trial by jury did not exist only in 1) an appeal from a proceeding to cancel a liquor license or other administrative decisions; 2) election contests; 3) adoptions; 4) child custody *habeas corpus* cases; and 5) contempt proceedings. *See* Harris, Jury Trial In Civil Cases—A Problem in Constitutional Interpretation, 7 S.W.Law J. 1, 7–14 (1953) (*citing cases*).

**14.** Generally, a master in a court of equity had certain powers to find facts, and, in non-jury trials, in many jurisdictions these findings must

The trial court instructed the jury that these findings were prima facie evidence of the disputed fact issues. The appellate court found error, but held the defendants' participation in hearings before the master waived the right to trial by jury.

The Supreme Court of Texas reversed, holding that mere participation in the proceeding before the master did not waive the right to trial by jury in the subsequent trial. This holding was also based on article V, § 10. The Court also declared that the statute must be construed so that the right to a jury trial was protected. It wrote: "the Legislature cannot deprive any party of his right to trial by jury in any cause, legal or equitable, and hence this statute must be so restricted in its operation as not by itself to have that effect." *Id.* at 199. The essence of the Court's holding was, absent waiver, the findings of the master could not be given any effect without violating the parties' right to trial by jury.

There is one striking similarity between *Culberson* and the instant case. Like the master in *Culberson*, the federal judge is sitting without a jury—essentially as in a trial to the court in equity. Yet, the Supreme Court of Texas held that such findings could have no effect on subsequent proceedings without violating the party's right to trial by jury under the Texas Constitution.

Several observations are in order. If imposing the master's findings upon litigants violates the right to a jury trial in Texas, then the same holds true for imposing the findings of another judge sitting without a jury if, through no fault of the party disputing the findings, that party was forced to allow the judge to make the findings. Moreover, if the Legislature cannot infringe the right to trial by jury by appointing a master, then the courts cannot do the same indirectly, such as through the doctrine of collateral estoppel. *See Davis v. Kight*, 252 S.W. 227, 228 (Tex.Civ.App.—San Antonio 1923, no writ) (If jury is timely demanded and fee paid, no action by the court can waive the right to trial by jury).

be adopted by the court unless clearly errone-

■■■ We conclude that art. V, § 10 and art. I, § 15 embody a Texas right to a jury trial which is greater than its federal counterpart. We are not bound by *Parklane* or other federal decisions which construe the United States Constitution. *Davenport*, 834 S.W.2d at 14. Rather, we have our own, independent constitution with rights which are different and sometimes greater than those found in the federal constitution. *Id.; Heitman v. State*, 815 S.W.2d 681, 685–90 (Tex.Crim.App.1991). We are mandated by art. I § 29 of our constitution "to guard against transgressions" upon the right to trial by jury, and to hold "all laws contrary" to this most important right "void." Application of the judicially created doctrine of collateral estoppel to this case is precisely the kind of transgression against the constitutionally protected right to trial by jury which § 29 prohibits.

Texans have a right to have questions of fact decided by a jury of their peers. Like the Supreme Court of Texas in *White v. White*, 196 S.W. at 512, we believe this right is "sacred," and a "bulwark of human liberty." This right should be particularly protected here: a federal judge, who was sitting in judgment over the Navy, found facts which absolved the Navy and its employees of all liability. Now other parties are attempting to take advantage of these findings to avoid their potential liability. All this occurred without any opportunity for a jury of Texas citizens to decide the dispositive fact issues.

One of the principal grievances the citizens of Texas held against the Mexican Government was the abridgment of the right to trial by jury. The Framers of the Texas Constitution placed great emphasis on this right by protecting it with two provisions which are clearly worded and prohibit infringement of the right. Our courts have consistently protected the right from infringements of all sorts. We doubt the Framers intended that collateral estoppel be used to infringe the right in the manner suggested.

ous. *See e.g.* Fed.R.Civ.P. 53(e)(2).

If we were to apply collateral estoppel here, there would never be the opportunity for the critical causation question to be decided by a jury. In short, the right to trial by jury on the most important fact in this litigation would be infringed. We hold that, under the facts of this case, application of collateral estoppel would violate the parties' right to trial by jury as protected by the Texas Constitution. TEX. CONST. art. I § 15 and art. V § 10. Accordingly, collateral estoppel does not apply.[15]

We do not doubt the federal government's power to waive sovereign immunity through the FTCA on the condition that a federal judge, rather than a jury, decide liability and damages. *See United States v. Sherwood*, 312 U.S. 584, 586–88, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941). However, no principle of law requires us to give preclusive effect to such findings in State District Court. Federal common law, to the extent it exists, does not require us to abridge appellants' rights under our State constitution in the manner suggested. Federalism encourages us to take the path less traveled, by providing greater rights to our citizens. *See* U.S. CONST. AMEND. 10.

■ The potato white appellees' remaining argument is that the parties waived their right to trial by jury, and that *Baker* precludes the result in this case. Whether facts found by a judge in a prior proceeding have preclusive effect in Texas depends upon whether the right to a jury trial was waived. *Culberson*, 101 S.W. at 198–99; *Baker*, 564 S.W.2d at 168. The facts here do not establish waiver.

■ In *Baker* plaintiff filed an FTCA claim against the United States claiming medical malpractice by an Air Force doctor. Suit was also filed in State District Court against the same doctor and others. Trial was first had in the federal action. The federal court found no negligence by the Air Force doctor.

In the second action, the Air Force doctor asserted collateral estoppel. The plaintiff argued that collateral estoppel would violate his right to trial by jury because he had no right to trial by jury in the FTCA action, and substituting the federal judge's findings in the second action for those of the jury would prevent him from ever presenting his case to a jury.

The Court found that the plaintiffs waived their right to trial by jury in the state court case because the plaintiffs:

> insisted on trying it in the federal court, … knowing he had no right to trial by jury under the Federal Tort Claims Act. The constitutional right to a trial by jury is not an absolute right but is a right that is available to litigants should they choose to exercise it, and not available to litigants if they should waive or give it up. Plaintiff chose the forum of the first litigation, and the fact that he was not entitled to a jury trial should not mitigate the effect of that judgment and destroy the plea of collateral estoppel.

*Id.* at 168. *Baker* stands for the proposition that if a right to trial by jury is waived in a prior action, such findings may have preclusive effect in a second action. The dispositive question is whether the parties knowingly, intelligently, and voluntarily waived their right to trial by jury on the common fact issues in the first proceeding. *See Coleman v. Sanders*, 608 S.W.2d 344, 346 (Tex.Civ.App.—Amarillo 1980, no writ).

In *Coleman*, a jury was erroneously denied to the plaintiffs over their objection. Plaintiffs were present and announced ready for trial. They lost. On appeal the plaintiffs argued that the right to trial by jury was violated, and the defendants argued that the right was waived by announcing ready, and participating in the trial. The Amarillo Court disagreed: "The trial court's ruling on the jury demand re-

---

**15.** Our holding here is independent of our prior holding on full and fair litigation. We strongly disagree with the *Parklane* Court's conclusion that whether or not the first case involved a right to trial by jury is basically a "neutral" factor in determining whether collateral estoppel should apply. *Id.* 439 U.S. at 332 n. 19, 99

S.Ct. at 652. Rather, in Texas, this factor is dispositive. We agree with the *Lytle* Court that a "jury and a judge can draw different conclusions from the same evidence." *Id.* 494 U.S. at 555, 110 S.Ct. at 1338. In Texas State Courts, a party is entitled to have a jury draw these conclusions.

moved the jury trial alternative and, in effect, left Coleman without a conscious choice between a jury and a non-jury trial." *See also Culberson,* 101 S.W. at 198–99.

Like *Coleman,* the plaintiffs in the instant case had no "conscious choice" between a jury and non-jury trial in the federal court because there is no right to trial by jury in FTCA actions. Thus, mere participation in that case was not a waiver of the right.

Also, in contrast to *Baker,* the instant case reveals that the State District Court defendants "chose the forum of the first litigation." *Baker,* 564 S.W.2d at 168. These defendants sought to have the federal case tried first. The evidence shows that they sought and received from the State District Court an unconstitutional order abating the state cause so they could seek intervention in the federal action. This eliminated the plaintiffs' priority trial setting. The plaintiffs objected, and even sought a writ of mandamus, which this Court provisionally granted, ordering the State District Court to proceed with the trial.

The evidence also shows that the primary forum of the litigation was in State District Court. The plaintiffs initially filed suit there, all defendants which could be sued there were joined. The Navy had to be sued in federal court, or not at all. *See* 28 U.S.C. § 2402 (1990). It was only an unforeseeable twist of events which allowed the federal action to proceed first: the federal court reversed its stay and on two weeks' notice tried the FTCA action.

Thus, in this case there is nothing in the record establishing that the plaintiffs waived their right to trial by jury by insisting on trying the federal court action first, and appellees' summary judgment proof certainly did not prove this as a matter of law. The plaintiffs' entire course of conduct demonstrates that they sought a jury trial first in State District Court. They demanded a jury and paid the jury fee; thus they are entitled to a jury trial. TEX. CONST. art. I § 10; TEX.R.CIV.P. 216. Their subsequent conduct also bears this out:

they are complaining on appeal that their right to trial by jury is infringed.

■ Merely proceeding to trial in a case in which a trial by jury is unavailable, without more, does not establish waiver of that right. *See Culberson,* 101 S.W. at 198–99; *Coleman,* 608 S.W.2d at 346. Filing suit against one defendant in a forum in which it must be sued and which does not provide a trial by jury is not evidence of waiver of that right in the remaining state court claims. Appellees failed to prove as a matter of law that appellants knowingly, intelligently, and purposefully waived their right to trial by jury.

To conclude, we hold the plaintiffs are not collaterally estopped from relitigating the issue whether potato white was present in the fruit bowl. There was no full and fair litigation of the question in the first proceeding because joinder was unavailable, a different burden of proof applies, the opportunity of other defendants to prove that potato white was a cause would be limited, and none of the policy objectives of collateral estoppel would be achieved. We also hold that precluding relitigation in this case would violate the appellants' right to trial by jury under the Texas Constitution, and that this right was not waived by participation in the federal proceeding.

## B. CAUSATION

We now turn to the next phase of this case, which is, whether each defendant's summary judgment evidence proved as a matter of law that its product did not cause Susan Trapnell's death.

In assessing the propriety of a motion for summary judgment, this Court and the trial court apply essentially the same standard. The issue is whether the movants' written motion for summary judgment and supporting evidence establish as a matter of law their right to judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). TEX.R.CIV.P. 166a. The evidence, any doubt, and all reasonable inferences must be indulged in the non-movants' favor. *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867 (Tex.1984). If the movant's motion and competent summary

judgment evidence establishes its right to judgment as a matter of law, the non-movant must present legally sufficient summary judgment evidence raising a fact issue. *See Trapnell v. John Hogan Interests, Inc.,* 809 S.W.2d 606, 611 (Tex.App.—Corpus Christi 1991, writ denied).

POTATO WHITE

■ In *Trapnell II* this Court held that the plaintiffs' summary judgment evidence raised a fact question regarding whether potato white was consumed by Susan Trapnell. *Id.* In addition to that summary judgment evidence, additional evidence has been filed by the potato white defendants and the plaintiffs.

Our prior ruling that the plaintiffs' summary judgment evidence raised a fact issue stands. Dr. Ronald Simon's affidavit clearly states that in his opinion, three products on Susan Trapnell's plate could have caused her reaction. He also stated that due to the speed and intensity of the reaction, the most likely cause of death was potato white. As discussed in *Trapnell II,* the counter affidavits of the cooks familiar with the preparation of the fruit bowl, and the other evidence, cannot alter the fact that Simon's affidavit is legally sufficient evidence that potato white was a cause of the death. We hold that a fact issue exists regarding whether potato white caused Susan Trapnell's death.

HASH BROWNS

■ The hash brown defendants, Allied, Univar, Lamb–Weston, and Sysco, filed a motion for summary judgment alleging that the summary judgment evidence conclusively establishes that there was no causal link between consumption of sulfites that they supplied and Susan Trapnell's death. The motions for summary judgment were supported with affidavits and deposition excerpts from Dr. Steve Taylor, Dr. Jacobsen, Dr. Simon, and other witnesses.

Dr. Taylor's affidavit concludes that the hash browns were not a substantial factor in causing Susan Trapnell's death. He states that if it is assumed that Susan Trapnell consumed only one-fourth or one-fifth of one hash brown serving,[16] and based on findings expressed in Dr. Jacobsons' affidavit, it is assumed that the hash brown portion contained an average or relatively high concentration of sulfites, then she consumed, at most, a total of .8 mg. of sulfites. If Susan Trapnell required a dose of at least 20 mg. to sustain a fatal reaction, then, he concludes, this level is so low that the hash browns were not a substantial factor in her death.

Other evidence, however, showed that only three products on Susan Trapnell's plate contained sulfites or are suspected of containing sulfites. Dr. Simon testified in his supplemental affidavit[17] that if the fruit salad is ruled out as a cause, then the hash browns and the apple pie filling must have caused the reaction because no other foods Susan Trapnell consumed contained sulfites. Thus, Simon's supplemental affidavit is some evidence supporting liability against both the hash browns and the apple pie filling defendants.

Further, the plaintiffs pleaded that the hash browns were both the sole cause or a contributing cause of Susan Trapnell's death. Low levels of bound sulfites could contribute to her failure to respond to attempts at resuscitation and her eventual death if consumed in conjunction with another source of sulfites, such as potato white. The hash brown defendants also failed to rebut the inference raised by Dr. Simon that an unusually large level of sul-

---

**16.** These estimates of the amount of hash browns consumed by Susan Trapnell come from the testimony of Mr. Mangohig, one of the Navy cooks. He testified that he thought between four-fifths and three-quarters of a four to five ounce serving of hash browns was left uneaten on Susan Trapnell's plate. He disposed of the plate before samples could be obtained.

**17.** Appellees complain that the supplemental affidavit is defective because it does not restate Dr. Simon's qualifications to render an expert opinion. The supplemental affidavit did not need to recite the qualifications stated in the initial affidavit discussed in *Trapnell II.* The affiant was the same in both affidavits, thus there is no question that if Simon was qualified to give the first, he is qualified to give the second.

fites was present in the particular hash browns consumed by Susan Trapnell.

This is a summary judgment proceeding. The only question is whether some legally sufficient evidence exists supporting the plaintiffs' theory that sulfites in the hash browns caused or contributed to Susan Trapnell's death. Simon's affidavit is legally sufficient evidence implicating the hash browns; thus, it is for the jury to determine the precise comparative causation issue.

APPLE PIE FILLING

The plaintiffs also alleged that apple pie filling caused or contributed to Susan Trapnell's death. The evidence showed that apple pie filling in the quantities possibly consumed by Susan Trapnell could have contained as much as 12.5 mg. of sulfites. This is more than one half of the lowest estimate of a lethal dose, which is 20 mg. Dr. Simon's affidavit states that apple pie filling could be a cause of her death. From this evidence a jury could conclude that this quantity of sulfites was a substantial factor in causing Susan Trapnell's death.

Dr. Simon also testified that the quantities of sulfites could have been higher in the particular food serving selected by Susan Trapnell. He noted that this would adequately explain her reaction and death, despite the testing data indicating lower levels in other samples.

We therefore conclude that the trial court erred in holding that each defendant proved as a matter of law that its product did not cause or contribute to Susan Trapnell's death. Summary judgments were improperly granted on the grounds of no causation. We now turn to the remaining issues, which involve limitations and the government contractor defense.

### C. SYSCO'S GOVERNMENT CONTRACTOR DEFENSE

Sysco pleaded and alleged in its motion for summary judgment that it was not liable because of the government contractor defense. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). We disagree.

In *Boyle* the plaintiffs sued Sikorsky, the manufacturer, for wrongful death. The plaintiffs alleged the death was caused by a defective hatch in a military helicopter. The helicopter and its hatch was manufactured according to specifications set forth by the United States Government. The plaintiffs won at trial and Sikorsky appealed.

On appeal Sikorsky argued that it was entitled to the same protection that the United States Government is provided in suits against the government because it was performing a contract for the government according to its specifications. The Fourth Circuit reversed, finding that Sikorsky established the "government contractor defense" as a matter of law.

The Court, addressing the issue for the first time, fashioned a common law defense to those suing the government for injuries caused by a product manufactured according to government specifications. The defense applies if 1) the United States approved reasonably precise specifications for the equipment; 2) the equipment conformed to the specifications; and 3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Id.* at 512, 108 S.Ct. at 2518.

The government contractor defense preempts state tort law compensating those injured by the manufacturer's performance of government procurement contracts. The basis for preemption is the unique federal interest which attaches to procurement of equipment. *Id.* at 506, 108 S.Ct. at 2515. The Court also noted that it would be anomalous for no liability to attach if the government manufactured the equipment, *see* 28 U.S.C. § 2680(a) (discretionary function exception to the FTCA), but for liability to attach against the manufacturer of government ordered equipment. *Id.* at 511, 108 S.Ct. at 2518. If this were the case, the Court reasoned, costs associated with tort liability would be passed through to the government by the manufacturer; thus, infringing upon a federal

interest. The Court accordingly held that state tort law was displaced under these circumstances.

■ Sysco argues that the government contractor defense applies here because sulfiting agents, such as potato white, were ordered by the government for use in food preparation. The plaintiffs argue that the elements of defense were not established by the summary judgment evidence.

In the instant case, Sysco's summary judgment evidence did not include evidence supporting any of the elements of the government contractor defense. Although the plaintiffs did not controvert any of the allegations of these pleadings or the motion for summary judgment, the summary judgment cannot stand on this ground.

A summary judgment must be supported by legally sufficient proof. *Cotton v. Ratholes, Inc.*, 699 S.W.2d 203, 205 (Tex. 1985); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The movant's failure to adduce legally sufficient summary judgment evidence on each element of the defense is fatal.

■ Sysco also argues that this point is waived because the plaintiffs did not include argument under their point of error complaining that the trial court erred in granting summary judgment. However, the plaintiffs' response complained of the impropriety of the government contractor defense. And in a point in its reply brief, the plaintiffs established that this defense was invalid. Thus, we conclude that the point was not waived.

### D. LIMITATIONS

Univar, Van Waters, and McKesson raised limitations as a defense to the claims alleged by the adult plaintiffs, Benjamin Trapnell and Polly Ann Haugh [18] in their ninth amended petition. They sought recovery for Susan Trapnell's injuries and death under the theories of negligence, strict liability, breach of warranty, conspiracy, and DTPA. They also sought recovery for loss of consortium. This petition

was filed six and one half years after Susan Trapnell died. Benjamin Trapnell and Polly Ann Haugh pleaded that they discovered the identity of each party less than two years before suit was filed against such parties.

■ In *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 352 (Tex.1990), the Supreme Court of Texas decided that a cause of action for injuries resulting in wrongful death accrues upon death, and not upon discovery of the cause of death. Tex.Civ. Prac. & Rem.Code Ann. § 16.003(b) (Vernon 1985). In *Russell v. Ingersoll–Rand Co.*, 841 S.W.2d 343 (1992), the Supreme Court of Texas held that survival and wrongful death claims could only be brought if the deceased could have asserted the claim. If a cause of action for injuries causing the death is barred by limitations, then the survival and death actions are also barred. Thus, the rule now is, that a wrongful death or survival claim accrues, at the latest, at the time of death.

■ In the instant case, each of the plaintiffs' theories of liability seeks recovery for injuries, death and loss of consortium. These claims were filed against these defendants more than two years after Susan Trapnell's death. *Moreno* and *Russell* bar recovery for the injury and death claims by the adult plaintiffs.

■ Their claims for loss of consortium are also barred by limitations. As an initial matter we note that it is not clear which limitations statute applies to a cause of action for loss of consortium. Several limitations statutes could apply including Tex.Civ.Prac. & Rem Code Ann. § 16.051 (Vernon 1985), the residual limitations statute, § 16.002, the one-year statute, and § 16.003, the two-year statute. Regardless of the parties' arguments, we must apply the correct statute of limitations because this is a question of law for the court. *Williams v. Khalaf,* 802 S.W.2d 651, 658 (Tex.1990); *Refugio Lumber Co. v. Baily,* 172 S.W.2d 133, 134 (Tex.Civ.App.—San Antonio 1943, writ ref'd).

---

**18.** There is no question that limitations does not bar suit against Nicholas Trapnell. He is a

minor. Tex.Civ.Prac. & Rem.Code Ann. § 16.001 (Vernon 1985).

We are guided by several decisions from the Supreme Court of Texas, including *Williams, Willis v. Maverick,* 760 S.W.2d 642 (Tex.1988), and *First National Bank v. Levine,* 721 S.W.2d 287 (Tex.1986). These cases demonstrate that the proper method for determining which statute of limitations applies is to identify the "common law term for a cause of action of those enumerated in the statutes of limitation that is most analogous to the modern counterpart." *Williams,* 802 S.W.2d at 654.[19]

For example, in *Williams,* the court reviewed the common law development of the cause of action for fraud and concluded that it was an action for a "debt." *See* § 16.004(a)(3). The *Levine* Court reviewed the development of the term "trespass" found in § 16.003(a) and decided that this term includes: "any act violative of the right of another through which injury is done to his estate or property." *Id.* at 289 (citing *Bear Bros. & Hirsch v. Marx & Kempner,* 63 Tex. 298 (1885)). The court noted that "trespass" includes what we now know as torts. Without discussion, the Court in *Willis* recognized that a cause of action for legal malpractice is "in the nature of a tort and is thus governed by the two-year limitations statute." *Willis,* 760 S.W.2d at 644 (citing *Levine* ).

█ Loss of consortium is a tort. In *Williams* the Court wrote that: "a tort not expressly covered by a limitation provision would presumptively be a "trespass" for limitations purposes." We therefore conclude that a cause of action for loss of consortium is governed by § 16.003, the two-year limitations statute which applies to a "trespass."

The next question we must address is when the cause of action for loss of consortium accrued. A cause of action under the legal injury rule accrues at the first point from which a party may seek a judicial remedy. *Houston Water Works v. Kennedy,* 70 Tex. 233, 8 S.W. 36 (1886). This is the point at which the tort complained of is completed; *i.e.* when facts supporting each element of the cause of action come into existence. *See Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967) (cause of action for negligence accrued at the time damages were first suffered). At this point a legal injury occurs.

A cause of action for loss of consortium accrues at the time of the first **wrongful** interference with any of the interests protected by the this tort. *See Turner v. Turner,* 385 S.W.2d 230, 238 (Tex.1964). These interests include affection, solace, comfort, companionship, society, assistance, and sexual relations. *Whittlesey,* 572 S.W.2d at 666. This point occurred at the latest when Susan Trapnell died. The plaintiff's pleadings show that this is more than two years before suit was filed against these defendants. Consequently, we hold the adult plaintiffs' loss of consortium claims against Univar, Van Waters, and McKesson barred by limitations.

## CONCLUSION

We sustain that portion of the trial court's summary judgment holding that limitations bars suit by Benjamin Trapnell and Polly Ann Haugh against Univar, Van Waters, and McKesson. Accordingly, appellants' sixth point of error, which complains that the trial court erred in granting summary judgment against these parties is overruled in part. Summary judgment was improperly granted against all other defendants because collateral estoppel does not apply, and there is a question of fact regarding whether each of the three foods present on Susan Trapnell's plate are suspected of containing sulfites actually caused or contributed in causing her death. Points of error one through five are sustained. Judgment is accordingly REVERSED in all respects against all defendants except Univar, Van Waters, and McKesson; judgment is AFFIRMED for these three defendants with respect to their defenses against the adult plaintiffs.

**19.** The reason why this method of analysis must be adopted in Texas is because in several cases the statutes of limitations segregate causes of action by their common law precursors rather than by identification of the cause of action by name. *Compare* § 16.002 (A person must bring suit for malicious prosecution, libel, slander ... within one year ...) with § 16.003 (A person must bring suit for trespass for injury ... within two years ...).

## ON MOTION FOR REHEARING

 Appellant, John Hogan Interests, Inc. d/b/a First Foods Company, Inc. (First Foods) files a motion for rehearing complaining that we failed to address its point of error in our original opinion. First Foods is correct in that respect. We will address it now.

First Foods argues in its sole point of error that if the trial court erred in granting appellees' motions for summary judgment with respect to the claims brought by the Trapnells then the trial court also erred in granting appellees' motions for summary judgment with respect to First Foods concerning its claims for contribution and indemnity. We previously dismissed First Foods' appeal against appellees Univar Corporation, Van Waters & Rogers, Inc. and McKesson Corporation.[1]

The claims and cross claims asserted against First Foods were previously severed from this action by the trial court and tested by appeal.[2] The trial court granted summary judgment in favor of First Foods. This Court reversed the summary judgment. Application for writ of error was denied.

The claims of First Foods for contribution and indemnity are derivative of the Trapnells' causes of action against appellees. We, therefore, also reverse the judgment of the trial court with respect to the summary judgment granted in favor of the appellees against whom First Foods appealed. The judgment of the trial court with respect to the summary judgments against First Foods is reversed and remanded to the trial court for the reasons expressed in our opinion in this case. First Foods' motion for rehearing is granted. All other motions for rehearing by all other parties are overruled.

---

1. *John Hogan Interests, Inc. v. Univar Corporation, Van Waters & Rogers, Inc., and McKesson Corporation,* No. 13–91–503–CV (Tex.App.—Corpus Christi, September 12, 1992, no writ).

2. *Trapnell v. John Hogan Interests, Inc.,* 809 S.W.2d 606 (Tex.App.—Corpus Christi 1991, writ denied).