Henry V. BROADY, Trustee, Appellant,

v.

John T. MITCHELL, Jr., Trustee,
Appellee.

No. 17169.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Aug. 31, 1978.

Rehearing Denied Sept. 28, 1978.

DeLange, Hudspeth, Pitman & Katz, Eugene J. Pitman, Houston, for appellant.

Wood, Campbell, Moody & Gibbs, Robin C. Gibbs, Houston, for appellee.

EVANS, Justice.

This is an action to recover damages for breach of an earnest money contract executed by appellant, Henry V. Broady, Trustee, as seller, and by appellee, John T. Mitchell, Jr., Trustee, as purchaser.

The trial court entered judgment for the purchaser on the jury's verdict, awarding damages for the difference between the agreed purchase price and the market value of the property at the time of its sale by the seller to a third party. The seller has appealed from that judgment, raising 24 points of error.

The earnest money agreement is dated August 23, 1977, and covers a small apartment project in West University Place near the City of Houston. The contract stipulated a total purchase price of $150,000.00, of which amount the sum of $16,000.00 was to be paid in cash at time of closing and the deferred consideration was to be represented by the purchaser's conveyance being made "subject to" an existing first lien indebtedness of $61,000.00 and the purchaser's "no personal liability" second lien note for the balance.

The contract designated Lawyers Title Company in Houston as escrow agent and provided the seller would furnish within 30 days from the date of his acceptance of the contract an owner's title policy commitment with the standard clause pertaining to area, boundaries and encroachments deleted therefrom and an updated survey "in form and substance acceptable to the title company" which would serve as a basis for the deletion of the clause from the title policy.

The contract stipulated that "the offer" would remain open until August 24, 1974, that time was of the essence, and that the closing would take place at the office of the escrow agent on or before 60 days from the date of execution of the contract "at purchaser's option."

The contract reflects that it was executed by the parties on August 23, 1974, and that the earnest money deposit in the sum of $1,000.00 was deposited with the title company on that date. Following the execution of the contract and the deposit of the earnest money with the title company, the parties set out to accomplish the matters required to consummate the sale.

It appears that the purchaser worked actively to assist the seller in meeting this

objective. On September 19, 1974, he wrote to the seller stating that he was concerned because some of the tenants in the apartment project claimed to own the appliances and air conditioners in their units and that he needed an accurate inventory of the appliances which were owned by the seller. He stated that there was a need for some adjustment in the down payment to compensate for the absence of those appliances which the seller did not own, and he listed a number of repairs which needed to be made. On September 24, he advised the seller that he had gone with the housing code inspector on the premises, and he listed a number of items requiring repair which the inspection had revealed. He suggested that an agreement be reached on a figure which would represent the cost of purchasing and installing good used appliances to compensate for those owned by tenants, and he stated that he wished to see a copy of the survey which the seller obtained when he first purchased the units to see if it had been updated and if it showed the location of any easements, rights-of-way, improvements or encroachments. He stated that he had listed all items which, in his opinion, required action prior to closing and asked that when such items had been accomplished, he be advised so that "we can schedule the closing." On October 14, 1974, he again wrote to the seller asking verification of the list which he had prepared from his notes indicating the appliances and air conditioner units not owned by the seller and stating his belief that he was due a $200.00 credit for each appliance not owned or not in proper working order at the time of closing. He again asked that when the listed items had been accomplished he be advised so that a closing might be scheduled and stated his view that since the stipulated closing date was October 22, 1974, "we may need to extend it for 30 days."

On October 16, 1974 the purchaser and the seller jointly executed a stipulation which recited that "due to delays and negotiations pertaining to the subject contract, we wish to extend the closing date until October 31, 1974."

Both parties testified that on or before October 31, 1974, the agreed time for closing was orally extended to November 1, 1974, and that at some point in their negotiation prior to November 1, 1974 they reached an agreement to reduce the amount of the purchase price by the sum of $2,500.00, as a credit to the purchaser for the aforementioned appliances and air conditioning units. Accordingly, it is undisputed that the parties agreed to close the transaction on November 1, 1974, and that the total purchase price for the property at that time was to be the sum of $102,500.00.

On November 1, 1974 both parties met at the title company for the purpose of closing the transaction. The purchaser testified that he was ready to close on that date and that he had the check for the cash down payment in his pocket. He testified that he did not tender the check because it became obvious "very early in the meeting" that the transaction could not be closed on that date. The seller was unable to furnish at that time an updated survey acceptable to the title company and thus was unable to provide the required title policy commitment. He was also unable to furnish an estoppel certificate, as required by the contract, which was to be executed by the mortgage company holding the first lien note. The purchaser testified that after November 1, 1974, he continued to regard the contract as being in full force and effect and that the seller indicated to him that he would obtain the necessary documents and would later meet with him to close the transaction. During the month of December the purchaser received "indications" from his attorney that the seller was willing to close in the early part of January, but no specific date was arranged. During the month of December he contacted the mortgage company several times to discover what procedural steps needed to be taken so that he could either take his conveyance subject to the first lien note or agree to assume the indebtedness. He testified that during the months of November and December he was ready, willing, and able to close the agreement and was working toward an early January closing.

On November 22, 1974, the purchaser's attorneys wrote to the seller and advised him that the purchaser was "ready to close" the contract and had complied with all his obligations thereunder. In this letter the purchaser's attorneys stated that the purchaser agreed to assume the mortgage, rather than take subject to it, and that the cash, note and deed of trust were escrowed at the title company awaiting closing. The letter stated that it was the purchaser's position that the seller had intentionally tried to breach the contract and that the seller was placed on notice that specific performance would be sought if he did not furnish the survey forthwith or agree to escrow the funds and proceed to close the transaction.

On January 9, 1975 the seller consummated a sale of the property to a third party for a purchase price of $115,000.00 and this action resulted.

The seller's testimony concerning the November 1 meeting does not differ materially from that of the purchaser. He admits that he was unable to furnish the four items needed to complete the closing at that time, but states that he left his deed with the title company on that date with the understanding that it would be returned to him on the following Friday if the matter was not closed by that time. He testified that after he received the purchaser's letter of November 22, 1974 he agreed to go through with the sale if the transaction was closed by January 2, 1975 upon the terms stipulated prior to the November 1 meeting. He stated that he had conveyed this information to the title closer and to the purchaser's attorney, but that he had not directly notified the purchaser of the January 2 closing date. He "just presumed" that they wanted to close and "if I had the survey there, that was it". He testified that he took the survey to the title company on January 2 and after being advised by the title closer that "they didn't have the money there" he considered the entire matter at an end. He stated that in extending the closing date to January 2, he did not believe he was doing so under the terms of the original contract because he "considered that contract out."

In response to special issues the jury found:

(1) That the parties had agreed to reduce the amount of the purchase price by the sum of $2,500.00;

(2) That the parties had reached an oral agreement to extend the date of closing to the early part of January 1975;

(3) That the seller had not terminated the contract prior to January 9, 1975, and;

(4) That prior to January 9, the purchaser had tendered substantial performance of his obligations under the contract.

The jury failed or refused to find from a preponderance of the evidence:

(2a) That the seller had, prior to January 2, 1975, given notice to the purchaser that the closing would be held at a particular time or place on that date.

The jury further found that the market value of the property was $130,000.00 on the date of the sale to the third party and on the basis of the jury's verdict the trial court entered judgment for the purchaser in the amount of $27,500.00 as damages with interest thereon from the date of the breach of contract.

It is the seller's contention that there is no evidence of the purchaser's tender of performance under the contract and that the evidence merely shows an attempted oral modification of a written agreement which falls within the prohibition of the statute of frauds. He contends that the fourth special issue was not an ultimate issue in the case and that the jury's verdict afforded no basis for a judgment in favor of the purchaser.

Under these points the seller argues that the earnest money contract was a mere option, as distinguished from a contract for the sale and purchase of land, and that since the purchaser did not tender his obligation at the time of closing, the option was never exercised.

■ The earnest money agreement provides that if the purchaser fails to complete the sale for reasons other than the seller's default, the seller "shall retain the Earnest Money heretofore paid as liquidated damages, and this Agreement shall be null and void and all obligations hereunder imposed upon either party shall cease and terminate." Since the seller's only contractual remedy in the event of the purchaser's default was the retention of the earnest money the agreement did constitute an option rather than a bilateral agreement for the sale and purchase of land. *Smith v. Hues*, 540 S.W.2d 485 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n. r. e.).

The seller further argues that since the agreement was an option, it must have been exercised strictly in accordance with its terms, and he contends that there is no evidence that the purchaser ever exercised or accepted the option according to its terms.

■ After the purchaser deposited the stipulated earnest money with the title company, he was under no duty to take any action in the matter until the seller made appropriate tender of his obligations under the contract. *Sterling v. Apple*, 513 S.W.2d 255, 258 (Tex.Civ.App.—Houston [1st Dist.] 1974, no writ).

■ It is undisputed that a closing date was set for November 1, 1974, and that at the designated time and place both parties met for the purpose of consummating the transaction. It is also undisputed that at the time of closing the seller failed to perform his obligations under the contract in that the title company did not accept his updated survey as a basis for deleting the printed exception from the title policy commitment. Thus, it was not due to the purchaser's inability to complete his obligations under the agreement, but rather to the seller's failure to make appropriate tender of his obligations that the sale was not consummated on the agreed date for closing. The failure of the purchaser to comply strictly with the terms and conditions of the option agreement will be excused when such failure is brought about by the conduct of the seller. *Tiffany Dev. Corp. v. Cangelosi*, 514 S.W.2d 321, 325 (Tex.Civ.App.—Houston [1st Dist.] 1974, no writ); *Jones v. Gibbs*, 133 Tex. 627, 130 S.W.2d 265, 131 S.W.2d 957 (1939).

■ A stipulated time limit for performance of an option agreement may be extended either by agreement or by waiver, even where the contract provides that time is of the essence, and the fact of such waiver may be shown either by parol or made to appear from the circumstances or the parties' course of dealing. *Smith v. Hues*, supra; *Puckett v. Hoover*, 146 Tex. 1, 202 S.W.2d 209 (1947).

■ The undisputed evidence shows that the parties did not close the transaction on November 1, 1974, in order that the seller would have time to obtain the survey and other documents required to be furnished by him under the contract. It clearly appears from the evidence that the parties did not contemplate that the purchaser would be required to make tender of his obligations until such time as the seller had furnished the documents necessary to meet his obligations. It was the seller's duty to notify the purchaser when he had fulfilled his obligations under the contract and that he was ready, willing, and able to close the transaction at some definite time, place, and date in the future. Since the seller failed to give such notification and, instead, precluded further negotiation with the purchaser by making a conveyance of the property to a third party, the purchaser was not required to make tender of his obligations as a prerequisite to recovery of damages for the seller's default. *McMillan v. Smith*, 363 S.W.2d 437 (Tex.1962); *Burford v. Pounders*, 145 Tex. 460, 199 S.W.2d 141 (1947).

■ The jury found in response to special issue number 2 that the seller and the purchaser had orally agreed to extend the time for closing until the early part of January 1975, and in response to special issue number 3 that the seller had not terminated the contract prior to his sale to the third party on January 9, 1975. The seller contends that the evidence is legally and factually

insufficient to support the jury's findings to special issue number 2 and that its findings in response to that special issue and to special issue number 3 are against the great weight and preponderance of the evidence.

The purchaser testified that he was ready, willing, and able to close the transaction during the months of November and December 1974, and that he understood they were working toward a closing in early January 1975. The letter from his attorneys to the seller dated November 22, 1974, and the seller's own testimony concerning his actions after receipt of that letter, tend to support the purchaser's version. The seller admitted that after receiving the letter of November 22, 1974, he would sell the property on the terms stipulated prior to the November 1, 1974 meeting. He testified:

Q. "Anyway, you wanted, you were agreeing that the purchaser through January, the early part of January, would have a right to close on that contract at $102,500?

A. On that price. Yes. $102,500.

Q. Did you thereafter undertake to set a specific closing date?

A. Well, I took the new survey down. And I was ready to close. I had told them that if they were ready by January 1st, which it was extended to January 2nd, because of a holiday, I would close the deal.

\*   \*   \*   \*   \*   \*

Q. In fact, as of January 1st, had you ever formally set a closing date?

A. Well, I don't know that, how I could set a closing date. All I could do was produce what I could produce, which was a new survey. And that was all I could do, sir."

The seller further testified that his surveyors went out on the property on December 31, 1974, and performed the necessary survey work, and that he obtained a blueprint of their survey on January 2, 1975 and took it to the title company office. He testified that he did not make a tender of his deed on January 2, 1975, because he understood from the title closer that the purchaser was unable to gain the approval of the mortgage company. He stated that he had made no effort to notify the purchaser of the closing on January 2 because he did not think that he was obligated to do so.

The purchaser testified that on January 2, 1975, a copy of the survey was mailed by the title company to his attorneys and that he received the survey from his attorneys on January 6, 1975. He did not learn that the property had been sold to a third party until January 13, 1975. He had never intended to forfeit his rights under the contract or to terminate the contract, and he had made every effort to close the transaction. He was never advised by the seller that the contract had been terminated.

The jury was at liberty to infer from the evidence that the parties had orally agreed at the time of the November 1, 1974 closing to extend the time for closing until the seller could fulfill his obligations under the contract. It could also have concluded from the evidence that the parties had agreed to close the transaction in early January 1975, but had never agreed upon a specified date in that month.

The seller's points of error challenging the evidentiary support of special issues 2 and 3 are overruled.

■ The seller further contends that there is no pleading to support the submission of special issues 2 and 3 and that the jury's findings with respect thereto are at variance with the purchaser's pleading that the seller had declared the contract terminated. These contentions will also be overruled. The purchaser's pleading alleges that the parties met at the title company on November 1, 1974 to close the transaction, at which time it was noted that the seller had failed to furnish an adequate survey, and that the closing was therefore held in abeyance pending delivery of such updated survey. The pleading recites that after the seller had stated that he would not perform the agreement, he thereafter agreed to honor the contract and to proceed with the closing, but that prior to consummation of

the transaction he breached the agreement by making the sale to a third party. These pleadings are consistent with the evidence adduced by the purchaser at the trial and are not at variance with the jury's findings in response to the issues submitted. The allegation in the pleading that the seller had unilaterally declared to the purchaser that he would not perform under the existing contract relates to his stated position prior to the time he received the demand letter from the purchaser's attorneys. The pleading clearly reflects that after making such declaration he changed his mind and agreed to go forward with the sale.

In his last two points of error the seller contends that the damages issues improperly inquired about the value of the property on January 9, 1975, the date of his sale to a third party, rather than November 1, 1974. He argues that there was no evidence from which the jury could find the amount of damages under an appropriate measure of damages. These contentions will be denied. There was no breach of the contract until January 9, 1975, when the seller conveyed the property to a third party and thus prevented consummation of his agreement with the purchaser. There was evidence that indicated the value of the property on January 9, 1975, to be as high as $150,000.00 and the jury found the market value on that date was $130,000.00. The trial court merely subtracted the purchase price of $102,500.00 from the amount found by the jury and awarded the seller the difference plus interest from the date of breach. Generally, the measure of damages for breach of contract to sell real estate is the difference between the contract price and the market value of the property at the time of the breach. *Elliott v. Henck*, 223 S.W.2d 292 (Tex.Civ.App.—Galveston 1949, writ ref'd n. r. e.); *Roselawn Cemetery, Inc. v. Martin*, 415 S.W.2d 442 (Tex.Civ.App.—San Antonio 1967, no writ).

The judgment of the trial court is affirmed.