CASA EL SOL–ACAPULCO, S.A. and Zu Corporation, Appellants,

v.

Dallas FONTENOT, Robert Watters, and Trumps, Inc., Appellees.

No. 14–92–01345–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 1, 1996.

Rehearing Overruled May 2, 1996.

David A. Furlow, Houston, Kenneth M. Morris, Houston, for appellants.

George M. Bishop, Houston, Ronald J. Waska, Houston, for appellees.

* The Honorable Ross A. Sears sitting by assign-

Before ANDERSON, HUDSON and SEARS*, JJ.

## MAJORITY OPINION

HUDSON, Justice.

This appeal arises from a dispute regarding the satisfaction of terms in an option contract. Based upon factual findings made by the jury, the trial court entered judgment in favor of appellees, Dallas Fontenot and Robert Watters ("Fontenot and Watters"). The jury found Fontenot and Watters failed to fulfill certain conditions of an option contract that would have entitled them to purchase properties and rights belonging to Casa El Sol Acapulco, S.A. ("CESA"). The jury found, however, that their failure to satisfy the conditions for acceptance should be excused. The trial court granted Fontenot and Watters specific performance by giving them another thirty days to accept the option. We reverse and render judgment in favor of appellants.

Although the events which preceded the attempted closing on March 5, 1991, are complicated, a brief outline will suffice here to set the context of the specific issues on appeal. The present dispute has its genesis in a settlement agreement effected on September 10, 1989, when numerous lawsuits between the parties were "resolved." At issue in these lawsuits was the management and control of a sexually oriented business known as Rick's Restaurant and Bar ("Rick's"). The settlement agreement awarded CESA the tangible assets of Rick's, namely, the property and building which accommodate the nightclub, and a note for 1.7 million dollars. Fontenot and Watters were awarded the intangible aspects of the business, namely, the ownership and management of Rick's. To implement this division, CESA obtained all the stock in three corporations, known as Zu, Bering, and Northland, which own or hold the rights to all the realty and appurtenant fixtures used by Rick's. Fontenot and Watters, on the other hand, acquired all the stock in Trumps, Inc. ("Trumps"). Trumps is the corporation that owns and manages Rick's. Trumps also agreed, as

ment.

part of the settlement, to make rental payments for the use of Zu's property pursuant to the terms of a lease contract. In addition, Fontenot and Watters were given the option to purchase all the stock in Zu, Bering, and Northland on or before March 5, 1991, provided they satisfied numerous conditions set forth in the settlement agreement. In February of 1991, Fontenot and Watters notified CESA that they wished to exercise the option. On the scheduled closing day, March 5, 1991, CESA refused to close on the transaction, alleging that Fontenot and Watters had failed to meet all the conditions required as part of their acceptance of the option contract.

At the conclusion of trial, three questions were presented to the jury. In its first two points of error, CESA attacks the propriety of jury questions two and three. Question number one asked the jury to determine whether Fontenot and Watters accepted the "stock purchase agreement option" on or before midnight of March 5, 1991. The instruction accompanying the question informed the jury that acceptance of the option means "performance of the conditions of the agreement." The jury found that Fontenot and Watters did not accept the option before it expired. Question number two asked whether the failure of Fontenot and Watters to meet the option conditions should be excused under the doctrine of disproportionate forfeiture. The third question asked the jury to decide whether the failure of Fontenot and Watters to satisfy the option conditions was due to CESA's conduct, namely, whether CESA concealed material facts from Fontenot and Watters. CESA argues that questions two and three are erroneous because: (1) question number two is a question of law for the court, and is legally immaterial in this case because disproportionate forfeiture is not applicable to disputes regarding unilateral "option" contracts; and (2) question three presents the issue of equitable estoppel which cannot create contract rights where none exist and which, by the terms of the question, was fatally flawed from the inception because it did not apprise the jury that estoppel by silence is applicable only where there is an affirmative duty to speak.

Before addressing the legal reasons which compel us to reverse the trial court's judgment, we recite the evidence presented by both sides regarding the attempted satisfaction of conditions of the option agreement. One of the conditions of the option agreement flowing from the 1989 settlement was that Fontenot and Watters satisfy the "Gentry Lien" and have it released of record. This lien was named after Ben Gentry, a former Trumps shareholder, who had previously sold his interest in the nightclub and who, because he was still owed approximately $200,000, held a lien on the property. On the final day of the option period, Fontenot and Watters retired the debt and obtained a release from Gentry. CESA refused to accept the release on the ground it had not been filed in the real property records of the Harris County Clerk.

Another disputed condition also concerned an encumbrance upon the property known as the "Sunbelt Lien." Pursuant to the 1989 settlement agreement, Fontenot and Watters had given CESA a first lien deed of trust on Trump's leasehold estate as a means of securing their debt to CESA. This condition was to protect CESA in the event of a possible default by Fontenot and Watters. In other words, if Fontenot and Watters defaulted, CESA could then become the tenant under the lease with Zu and continue operation of the nightclub. Fontenot and Watters, however, had previously borrowed $575,000 from Sunbelt National Bank on a promissory note secured by a deed of trust on real property owned by Zu. If Trumps defaulted on its loan, CESA wanted to make certain that its first lien deed of trust on Trumps leasehold estate was superior to Sunbelt's lien on the property being leased. To protect itself from such a default, CESA insisted that it have the right to take over the management of Rick's without fear that a foreclosure by Sunbelt would void its lease and effectively terminate the business. One of the conditions of the option agreement, therefore, was that the Sunbelt Lien be subordinate to the lease.

To comply with this condition, Fontenot and Watters obtained a "nondisturbance and attornment agreement" from Sunbelt Nation-

al Bank that they contend made Sunbelt's lien subordinate to the lease. CESA contends, however, that the attornment agreement does not sufficiently protect its interest in Trumps' leasehold estate.

A less specific condition of the option agreement called for Fontenot and Watters to satisfy *all* liens and encumbrances on the land. Sometime after 1989, a tax lien was placed on the property by the Internal Revenue Service. Fontenot and Watters tried to persuade CESA to pay the debt because CESA owns Zu, and the lien was placed against the property when Zu failed to fully pay its taxes. CESA refused to satisfy the lien because the taxes accrued before the settlement agreement and at a time when Fontenot and Watters owned Zu. Because they never resolved this dispute, Fontenot and Watters put $10,000 in an escrow account to satisfy the tax lien. CESA claims this action falls well short of satisfying the condition that all liens and encumbrances be satisfied.

A final point of contention arose between the parties regarding the payment of money. To exercise the option, Fontenot and Watters had to tender $550,000 "in cash" to CESA. On the last day of the option period, Fontenot and Watters tendered a check from Heritage Title Company. CESA rejected the tender on the ground that the option agreement specified "cash."

After considering this evidence, the jury found that Fontenot and Watters had not complied with the conditions of the agreement. Fontenot and Watters argued in the alternative that if they failed to strictly comply with the conditions of the option agreement, equity should excuse their failure because CESA prevented them from meeting the conditions. Thus, they submitted questions two and three which would authorize the jury to find a legal basis for excusing their failure to perform.

Fontenot and Watters point to the following evidence in support of the jury's conclusion that CESA prevented them from meeting the option requirements. First, Salah Izzedin, a principal of CESA, allegedly told a former employee of CESA in the fall of 1990 that he hoped to frustrate any attempt by Fontenot and Watters to exercise the option agreement. Although the evidence was disputed, Fontenot and Watters also presented testimony that CESA's counsel said he did not want to inspect drafts of the closing documents, but then protested on March 4, 1991, when the documents had not been furnished to him. Yet when the documents were subsequently delivered to CESA's attorney, he did not review them until the waning hours of the last day of the option period. Fontenot and Watters further contend that on the afternoon of March 5, 1991, they had no reason to suspect that they had not satisfactorily complied in every material respect with the option conditions. They argue that CESA deliberately delayed the time of the closing until after 5:00 p.m. to prevent them from rectifying any of the alleged deficiencies and objections that CESA interposed at the closing.

The specific legal grounds which Fontenot and Watters submitted to the jury to excuse their failure to perform were based on the theories of disproportionate forfeiture and equitable estoppel. The case mentioned in the trial court and cited on appeal to support the imposition of equitable relief is *Jones v. Gibbs,* 133 Tex. 627, 130 S.W.2d 265 (1939). In that case, Gibbs had purchased the right to cut and remove timber on Jones' land for ten years. Gibbs also possessed an option to extend the ten-year period by depositing $205.68 year to year in the First National Bank of Huntsville to the credit of Jones. However, pursuant to Jones' written instructions, Gibbs made the first option payment to Wynne, a person to whom Jones was indebted. The following year, Gibbs made another payment of $205.68 to Wynne without written authorization from Jones. On this occasion, Jones protested and sued to obtain a judgment decreeing that the option agreement had expired because Gibbs did not strictly comply with the condition that payment be made to the First National Bank of Huntsville. The facts were not in dispute as to any material issue, and the trial court entered judgment on an instructed verdict in favor of Gibbs.

The commission of appeals held that equity favored Gibbs under either of the conflicting

factual scenarios presented by the parties, and the supreme court adopted its opinion. The court reasoned that if Jones authorized Gibbs to make the second payment to Wynne, Gibbs' failure to comply strictly with the terms and conditions of the option was excused because it was caused by the conduct of Jones. If Jones did not expressly authorize the payment to Wynne, Gibbs was nevertheless acting under the honest and justifiable, if mistaken, belief that Jones had consented and directed that the second payment also be made to Wynne. Because termination of Gibbs' timber rights would result in substantial loss, the commission concluded that a court of equity must excuse Gibbs' mistake to prevent unconscionable hardship.

 Two factors distinguish *Jones v. Gibbs* from the case before us, and preclude the application of equitable relief under the authority of that decision. First, the unusual features associated with the option agreement in *Jones v. Gibbs* are not present here. Ordinarily, the doctrine of inequitable forfeiture is not applied to cases involving option contracts, because the option holder rarely stands to lose more than his power to exercise the option.[1] The doctrine of disproportionate forfeiture may be applied, however, when termination of the option agreement will cause the unconscionable loss of improvements or tangible assets.[2] *Jones v. Gibbs* properly applied the doctrine of disproportionate forfeiture. The court observed that Gibbs "acquired under the deed a right or privilege differing ... from the ordinary option to buy." *Id.*, 130 S.W.2d at 268. In most instances, the holder of an option to buy property does not pay for the property until he exercises the option. Gibbs, however, purchased the timber in full before he attempted to exercise his option to extend the

time period for removing the timber from Jones' land. The court pointed to this difference as being the basis for its opinion:

> In view of the differences between the option for extension granted by the deed to defendant in error and the ordinary option to buy land, it is our opinion that, in determining whether defendant in error did those things necessary under the deed to extend the right to cut the timber, a too exactly strict compliance with the terms of the option should not be required and that the equities in favor of defendants in error, on account of their having paid the purchase price for all of the timber and having removed less than one-third of it, should not be disregarded.

*Jones v. Gibbs,* 130 S.W.2d at 269. Because the option agreement here contains none of the unusual features recited in *Jones v. Gibbs,* we believe appellees' reliance on that decision is misplaced.

Second, even if Fontenot and Watters had presented evidence of unconscionable loss, another important distinction exists. The trial court in *Jones v. Gibbs* was authorized to apply the doctrine of inequitable forfeiture without submitting factual issues to the jury because the facts were not contested on any material issue. Under either party's version of the facts, the optionee was excused from strict compliance with the option conditions. In the case before us, however, the facts were strongly contested on several material issues. CESA contends, for example, that its attorney repeatedly reminded Fontenot and Watters that he would need time to review the closing documents. Moreover, CESA presented evidence that Fontenot and Watters promised to present the closing documents to CESA's attorney by February 27,

---

1. "Option contracts do not come within the equitable rule against forfeiture, inasmuch as failure to comply strictly with the conditions of the option deprives no party of any right and abrogates no contract." 17A Am.Jur.2d *Contracts* § 73 (1991).

2. In the case of an ordinary option to buy there is no forfeiture. The option holder has paid a consideration for a legal power with a specified period of life. That power is the exact agreed equivalent for the consideration; and to extend the power for a day is to compel the giving of

something for nothing. The facts may be different, however, in the case of a lease with an option to buy or renew. In such cases the lessee may make extensive and valuable improvements in expectation of exercising his power to buy or to renew. When such is the case, he should not be compelled to forfeit these improvements to the lessor merely because he has forgotten to give notice until a few days after the specified time has expired.

5A Arthur Linton Corbin, Corbin on Contracts § 1177, at 321 (1964).

1991, six days before the expiration of the option period. Fontenot and Watters failed to deliver the documents as promised, and CESA alleged its lawyer did not have an opportunity to inspect the documents until 6:00 p.m. on the penultimate day of the option period.

Fontenot and Watters, on the other hand, presented evidence they informed CESA as early as February 14, 1991, that they wanted to exercise the option. The option agreement specifically required that certain closing documents had to be "reasonably acceptable to CESA and its counsel" in form and content. CESA's attorney, however, delayed the proceedings by refusing to provide any assistance or guidance in drafting the documents. When asked what specific provisions should be included in the closing documents, CESA's attorney reportedly told the Trumps' lawyer to give it his "best shot."

■ Unlike the situation presented in *Jones v. Gibbs*, here it was incumbent upon the trial court to have the jury resolve several disputed fact issues before deciding whether to grant equitable relief. Accordingly, before Fontenot and Watters could seek relief under *Jones v. Gibbs*, the jury had to first conclude that (1) their failure to satisfy the option conditions was due to CESA's conduct, or (2) it was the result of an honest and justifiable mistake that, if not excused, would lead to unconscionable hardship.

■ This leads us to a discussion of jury questions two and three. We hold that Fontenot and Watters did not submit these questions to the jury in language that would have resolved the factual issues that were a necessary prerequisite to the application of equity. For example, the court's second jury question asked whether the failure of Fontenot and Watters to meet the option conditions should be excused under the doctrine of disproportionate forfeiture.[3] This doctrine will

excuse the nonoccurrence of an immaterial condition if adherence to such condition would result in a disproportionate forfeiture. CESA and Zu objected to the second question on the grounds that: (1) the question improperly presented a legal, rather than factual, issue to the jury; and (2) the doctrine of disproportionate forfeiture does *not* apply to unilateral option contracts.

■ There is no common-law right to a jury trial in equity. *Trapnell v. Sysco Food Services, Inc.*, 850 S.W.2d 529, 543 (Tex. App.—Corpus Christi 1992), *aff'd*, 890 S.W.2d 796 (Tex.1994). However, two provisions of the constitution insure the right to a jury trial in Texas. The first is contained in the Texas Bill of Rights. *See* TEX. CONST. art. I, § 15. This provision guarantees "the right to a jury in all actions where that right existed at the time the Constitution was adopted." *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 291 (Tex.1975). Because the English chancery were judges of both fact and law at the time our constitution was enacted, this provision does not alter the common law tradition eschewing juries in equity actions.[4]

■ Because of Texans' familiarity with Spanish law and procedure, they adopted a second constitutional provision insuring the right to a jury trial in all causes. This provision is found in the Judiciary Article. *See* TEX. CONST. art. V, § 10. Thus, in Texas, the "traditional distinctions between actions at law and suits in equity have never carried the procedural significance accorded to them in other states of the Union." [5] The law in Texas is that the right to a jury trial extends to *disputed issues of fact in equitable as well as legal proceedings*. *Jeter v. Associated Rack Corp.*, 607 S.W.2d 272, 277–78 (Tex.Civ. App.—Texarkana 1980, writ ref'd n.r.e.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 507, 70

---

**3.** In determining whether the forfeiture is "disproportionate," a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture.

RESTATEMENT (SECOND) OF CONTRACTS § 229 cmt. b (1981).

**4.** 49 TEX.JUR.3d *Jury* § 13 (1986).

**5.** 1 ROY W. MCDONALD, TEXAS CIVIL PRACTICE § 4:4 (rev. 1992). For an analysis of the constitutional history, see *Credit Bureau of Laredo, Inc.*, 530 S.W.2d at 292.

L.Ed.2d 381 (1981). The jury, however, should not determine the expediency, necessity, or propriety of equitable relief. *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex.1979).

Appellants cite *Reynolds–Penland Co. v. Hexter & Lobello*, 567 S.W.2d 237, 245–46 (Tex.Civ.App.—Dallas 1978, writ dism'd by agr.) in support their contention that jurors do not decide equitable issues. In that case, the court of civil appeals concluded that the questions of what constitutes an "honest and justifiable mistake" and/or unconscionable hardship are issues to be decided by the court. It was also held that the disposition of these issues is in the sound discretion of the trial court, subject to an abuse of discretion standard on appeal. *Id.*, at 246. The court in *Reynolds–Penland*, however, was confronted with an appeal from the granting of summary judgment, and the facts were not in dispute. In the case before us, Fontenot and Watters presented considerable evidence showing their alleged attempts to satisfy the conditions necessary to exercise the option. CESA strongly refuted this evidence, and both sides differed deeply as to the significance of the deficiencies remaining at midnight on March 5, 1991. Before answering the second question in the affirmative, the jury had to first conclude that the deficiencies remaining at the time of closing formed no essential part of the option agreement. We hold this is precisely the kind of factual issue that, even in equity, should be decided by a jury.

CESA also contends that the trial court erred in submitting the issue to the jury because the doctrine of disproportionate forfeiture is not applicable to disputes regarding unilateral "option" contracts. We agree the doctrine does not ordinarily apply in cases involving option agreements. In most instances, termination of the option does not divest the option holder of rights, assets, or property other than the power to exercise the option.[6] *See B.F. Saul Real Estate Inv. Trust v. McGovern*, 683 S.W.2d 531, 534 (Tex.App.—El Paso 1984, no writ) (holding that an option contract does not come within the equitable rule against forfeiture since failure to comply strictly with the conditions of the option deprives no party of any right and abrogates no contract). *See also Guy Dean's Lake Shore Marina, Inc. v. Ramey*, 246 Neb. 258, 259, 518 N.W.2d 129, 130 (1994); *TST, Ltd. v. Houston*, 256 Ga. 679, 353 S.E.2d 26 (1987); *Cillessen v. Kona Co.*, 73 N.M. 297, 300, 387 P.2d 867, 869 (1964); *County of Peoria v. Najman*, 168 Ill.App.3d 1083, 1086, 119 Ill.Dec. 767, 769, 523 N.E.2d 375, 377 (1988). In some cases, however, the doctrine may be applied if the termination of the option will result in the unconscionable loss of investments made in reliance upon the option. *See Jones v. Gibbs*, 130 S.W.2d at 268–69 (where termination of the option would result in the loss of timber already purchased by the option holder); *Inn of Hills, Ltd. v. Schulgen & Kaiser*, 723 S.W.2d 299, 301 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.) (where option holder purchased a Texaco distributorship and bulk plant in reliance upon the continued existence of a lease).

Fontenot and Watters direct us to expenditures they have made in rent and in satisfaction of the Gentry lien. They contend these expenditures constitute an investment which will be forfeited if they are not permitted to exercise their option. Fontenot and Watters, however, were obligated to make rental payments under their lease without regard to whether they exercised their option to purchase the property. Further, Gentry's lien encumbered their leasehold interest as a result of a settlement agreement executed apart from the option agreement. We do not regard these expenditures as investments

---

**6.** If the time for acceptance of an ordinary offer is expressly limited by the offeror, acceptance must take place within that time or not at all; time is of the essence. The same is true of an offer that has the form of an option contract.... When that time expires, the option holder has received the full agreed equivalent of the price he paid for his option; and a refusal to give effect to an acceptance that is one minute late results in no forfeiture.

The primary reason for holding that time is of the essence in an option contract is that the parties have expressly made it so.

1A Corbin *supra* § 273, at 588, 593.

which were "lost" or forfeited by the expiration of the option agreement.[7]

 Fontenot and Watters contend the contract at issue formed a bilateral agreement. In rare instances, an option agreement may be bilateral rather than unilateral.[8] However, Fontenot and Watters claim the agreement here was not an option contract at all, but a bilateral contract specifically enforceable against both parties. Under a bilateral contract, we might be inclined to excuse the non-occurrence of a condition to prevent disproportionate forfeiture. In this case, however, we have neither disproportionate forfeiture nor a bilateral contract.[9] Because the doctrine of disproportionate forfeiture was not applicable in this instance, it should not have been submitted as a jury issue.

The third question before the jury was to decide whether Fontenot and Watters' failure to satisfy the option conditions was the result of CESA's concealment of material facts. This question is closely akin to the second issue raised in *Jones v. Gibbs*, i.e., whether the optionee's failure to comply with the conditions of the option was due to "the conduct of the optionor." *Jones*, 130 S.W.2d at 272. The law applied in *Jones* was based on the well established doctrine that an optionor may not hinder the optionee's attempt to exercise the option. "The failure of the purchaser to comply strictly with the terms and conditions of the option agreement will be excused when such failure is brought about by the conduct of the seller." *Broady v. Mitchell*, 572 S.W.2d 36, 40 (Tex.Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.). *Also Cattle Feeders, Inc. v. Jordan*, 549 S.W.2d 29, 33 (Tex.Civ.App.—Corpus Christi 1977, no writ); *Colligan v. Smith*, 366 S.W.2d 816, 820 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.).

CESA contends the question, as presented to the jury in this case, was specifically based on the doctrine of equitable estoppel.[10] CESA argues the doctrine has no relevance in this case because: 1) as submitted, the equitable estoppel question is fatally flawed; and 2) equitable estoppel is a defensive issue and cannot be used to create contract rights where none exist.

 The elements of equitable estoppel are: 1) a false representation or concealment of material facts; 2) made with knowledge, actual or constructive, of those facts; 3) with the intention that it should be acted on; 4) to a party without knowledge, or the means of acquiring knowledge of those facts; 5) who detrimentally relied upon the misrepresentation. *Schroeder v. Texas Iron Works*, 813 S.W.2d 483, 489 (Tex.1991) (citing *Gulbenkian v. Penn*, 151 Tex. 412, 418, 252 S.W.2d

---

7. When the optionee decides to exercise his option, he must act unconditionally and according to the terms of the option, and as soon as the acceptance is so made, the optionor becomes bound. Nothing less than an unconditional and precise acceptance will suffice unless the optionor waives one or more of the terms of the option. Thus, if payment by the optionee is required before the termination date of the option, exercise of the option can only be accomplished by timely payment. Because the option itself affords the offeree protection against the offeror's inconsistent action, the general attitude of the courts is to construe the attempt to accept the terms offered under the option strictly. The problem of a potential forfeiture does not enter into the matter.

1 Samuel Williston, A Treatise on the Law of Contracts § 737, at 740–41 (Richard A. Lord ed., 4th ed. 1990).

8. An option contract can be either unilateral or bilateral.... If A pays B $100 cash in return for B's promise to convey Blackacre to A for $5,000 if paid in thirty days, they have made a unilateral option contract.... On the other hand, suppose that instead of paying cash A had given to B his promissory note for $100, or his oral promise to pay that sum, in return for B's promise to convey Blackacre to A for $5,000, if paid within thirty days. The contract thus made is bilateral, each party having made a binding promise.

1A Corbin, *supra* § 260, at 466.

9. An option is a privilege or right that the owner of property gives another to buy certain property at a fixed price within a certain period. *State v. Clevenger*, 384 S.W.2d 207, 210 (Tex.Civ.App.—Houston 1964, writ ref'd n.r.e.). An option contract has two components: 1) the underlying contract which is not binding until accepted; and 2) the covenant to hold open to the optionee the opportunity to accept. *Hott v. Pearcy/Christon, Inc.*, 663 S.W.2d 851, 853 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). The contract here is a classic option agreement.

10. Fontenot and Watters concede in their brief that it appears the issue was adapted from Texas Pattern Jury Charges PJC 101.25 (1990) regarding the defense of estoppel.

929, 932 (1952)); *Riley v. Meriwether*, 780 S.W.2d 919, 926 (Tex.App.—El Paso 1989, writ denied).

The question presented to the jury in this case asked if CESA had "concealed material facts." It did not ask about affirmative misrepresentations, but was in the nature of "estoppel by silence." Estoppel by silence arises only if a person is under a duty to speak, but refrains from doing so and thereby leads another to act in reliance on a mistaken understanding of the facts. *Williams v. Stansbury*, 649 S.W.2d 293, 296 (Tex.1983); *Pioneer Oil Co. v. Vallejo*, 750 S.W.2d 928, 930 (Tex.App.—Corpus Christi 1988, no writ). Moreover, an affirmative duty to speak or disclose arises only when a confidential or fiduciary relationship exists between the parties. *Bernstein v. Portland Sav. and Loan Ass'n*, 850 S.W.2d 694, 701 (Tex.App.—Corpus Christi 1993, writ denied); *Stephanz v. Laird*, 846 S.W.2d 895, 904 (Tex.App.—Houston [1st Dist.] 1993, writ denied). *See also Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex.1983); *Schiller v. Elick*, 150 Tex. 363, 240 S.W.2d 997, 1000 (1951). Thus, unless there is a fiduciary or confidential relationship between the parties, no duty to disclose arises and there can be no estoppel by silence.[11] There was no evidence in this case to establish the existence of a confidential or fiduciary relationship, and Fontenot and Watters submitted no jury instruction on the relationship necessary to give rise to a duty to disclose.

A proper charge on the issue of equitable estoppel may be found in 4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 101.25 (1990). The same charge was submitted here except that the words "made a false representation" were deleted from the instruction. CESA objected to the charge because there was nothing in the instruction to inform the jury that CESA had a duty to disclose *only* if it had a confidential or fiduciary relationship with Fontenot and Watters. The comment to PJC 101.25 highlights the error made here:

Estoppel may also be based on silence or inaction, rather than on affirmative misrepresentation, if one under a duty to speak or act has by his silence or inaction misled the opposing party to his detriment. *Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex.1979); *Scott v. Vandor*, 671 S.W.2d 79, 87 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). *If estoppel is based on something other than affirmative misrepresentations, a different instruction should be substituted for PJC 101.25.*

4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 101.25 (1990) (emphasis added).

In *Jones v. Gibbs*, the court relied on affirmative acts and statements of the optionor in concluding that his conduct was responsible for the optionee's failure to satisfy the condition needed to accept the option. In this case the jury could consider only the issue of concealment or "estoppel by silence." The trial court erred in giving the jury an instruction on estoppel by silence without also submitting a concomitant instruction regarding a duty to disclose arising from a confidential relationship or fiduciary duty between the parties.

In addition, we find no evidence in the record before us to show the existence of a confidential relationship or fiduciary duty between the parties. Accordingly, even if the trial court had submitted a correctly worded instruction on estoppel by silence, the jury had before it no evidence that could have supported such a finding.

The improper submission of charge questions constitutes reversible error when, considering the charge as a whole, harm is suffered by the complaining party. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex.1980). Both the second and third jury questions were legally immaterial. Moreover, we hold the defective questions could, and probably did, mislead the jury. Appellants' first and second points of error are sustained.

Because we have determined the trial court should not have submitted the second

---

11. A mere contractual relationship does not impose an affirmative duty to disclose. *Crim Truck & Tractor Co. v. Navistar Int'l Trans. Corp.*, 823 S.W.2d 591, 594 (Tex.1992).

and third special issues, we need not address CESA's third and fourth points of error.

In points of error five and six, CESA complains about the attorneys fees awarded to Fontenot and Watters. Because Fontenot and Watters are not entitled to judgment, they are not entitled to attorneys fees. *See Rodgers v. RAB Investments, Ltd.,* 816 S.W.2d 543, 551 (Tex.App.—Dallas 1991, no writ). Reviewing CESA's contentions under these two points of error is, therefore, unnecessary.

■ In its seventh and eighth points of error, CESA argues that the trial court erred in making unnecessary and improper findings of fact and conclusions of law regarding issues tried to the jury. All issues were tried to the jury except attorneys fees and issues to be resolved by the court as a matter of law, i.e., specific performance and the declaratory judgment concerning the lease and rental payments. After the trial, Fontenot and Watters requested findings of fact and conclusions of law "with regard to any and all matters tried to, or determined by, the Court without a jury." While the trial court issued findings of fact and conclusions of law on the entire case, it stated that it "in no way amends, modified, alters, changes, or otherwise disturbs the findings of the jury."

All liability issues, except the declaratory judgment action as to the Zu/Trumps lease, were tried to the jury. The only other issues involved attorneys fees and the imposition of specific performance as damages if the jury found liability. Thus, findings of fact and conclusions of law on anything other than the declaratory judgment, attorney's fees, and the availability of specific performance here were unnecessary. *Rathmell v. Morrison,* 732 S.W.2d 6, 16–17 (Tex.App.—Houston [14th Dist.] 1987, no writ). This is not a case where the trial court was authorized to make findings of fact on omitted issues necessary to sustain a ground of recovery where the jury has made findings on some but not all of such issues. *Id.; see* Tex.R.Civ.P. 279. CESA's seventh and eighth points of error are sustained.

■ In its ninth point of error, CESA alleges the trial court erred in refusing to declare the lease terminated as a matter of law. Zu claims that Trumps failed to make its July 1991, rent payment and that this default remained uncured for ten days contrary to the terms of the lease. Zu filed a forcible entry and detainer action claiming that Trumps had defaulted under the lease. In response, Trumps has deposited monthly rental payments into the registry of the court.

The lease between Trumps and Zu provided that rent payments are "due and payable in advance of the 15th day of each month." The lease also provides that any failure by Trumps "to pay any installment of rent due under this Lease and the failure continues for a period of ten (10) days" constitutes a default. The lease states that in the event of a default, Zu has the option, without notice or demand, to terminate the lease. The record demonstrates Trumps failed to make its July 15th payment and failed to cure its default on or before July 25, 1991. By its letter of July 26, 1991, Zu terminated the lease.

Both parties agree the issue of whether the lease was terminated is a question of law. Based on the undisputed facts and the plain language of the lease, we hold the lease was properly terminated by Zu. Appellant's ninth point of error is sustained.

Fontenot and Watters raise four cross points in this appeal. The first cross point concerns the rental payments under the Zu/Trumps lease and the rental amounts potentially awarded to Fontenot and Watters under the trial court's judgment. Due to the disposition of this appeal, addressing this contention is unnecessary.

Fontenot and Watters complain, in their second cross-point, that the trial court erred in not awarding them the full amount of claimed attorneys fees. This point is without merit because Fontenot and Watters have not prevailed. *See Rodgers,* 816 S.W.2d at 551. Cross-point two is overruled.

In cross-point three, Fontenot and Watters complain that the trial court erred in refusing to find that their failure to satisfy the option conditions was excused as a matter of

law. In support of their argument, Fontenot and Watters incorporate their arguments in reply to CESA's first and second points of error. Based on our discussion under points of error one and two, we hold that the trial court could not find that the failure of Fontenot and Watters to satisfy the option conditions was excused as a matter of law without first properly resolving the contested fact issues. Fontenot and Watters were not entitled to judgment based on legal excuse as a matter of law. The third cross-point is overruled.

▇ In their final cross-point, Fontenot and Watters take issue with the jury's finding on question number one and argue the trial court should have found that they complied with the terms of the option agreement as a matter of law. The jury found that Fontenot and Watters failed to comply with the necessary conditions and accept the option before its expiration. We have extensively reviewed all of the evidence in this case, and detailed much of it in this opinion. Based on a review of the evidence supporting the jury's finding in question number one, we hold the evidence supports the jury's finding that Fontenot and Watters failed to comply with the conditions of the option agreement. Appellee's fourth cross-point is overruled.

The judgment of the trial court is reversed and judgment is rendered in favor of appellants.

SEARS, Justice (Assigned), dissenting.

I respectfully dissent.

The basic mistake in the majority opinion is the finding that the option agreement was a unilateral contract. This is contrary to the facts, the conclusion of law reached by the trial court, and the existing case law of Texas.

The facts show there were several lawsuits pending between these parties which were all compromised and settled by the simultaneous execution of 37 documents. Therefore, the option agreement was only one of 37 documents which the parties executed in order to fully settle all their disputes. These documents are all intertwined and impose duties and obligations on all parties. It is not logi-

cal and there is no legal precedent for separating one of these documents from the other 36 and finding the one to be "unilateral." In fact, the trial court rejected several jury instructions filed by the Appellants which would have instructed the jury that "the Purchase Option was a unilateral offer." Further, the Appellants' have not assigned a point of error for the trial courts' failure to so instruct the jury. Therefore error, if any, is waived. *Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex.1990); *Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex.1987).

The sale of the old St. Anthony Hotel in San Antonio, Texas, involved remarkably similar transactions. Several parties were involved in several disputes which were all compromised and settled by the execution of several documents. Lease agreements and a stock purchase agreement were among the settlement documents. One side tried to defeat the exercise of the option by claiming the option was a unilateral contract and must be read separate and apart from the other settlement documents. The other side claimed the documents were all part of the settlement and could not be separated to defeat the option. The trial court agreed that "all documents and instruments executed and delivered in furtherance of such objective should be read and construed together." *Morrison v. St. Anthony Hotel*, 274 S.W.2d 556 (Tex.Civ.App.—Austin 1955, writ ref'd n.r.e.). This is still good law and is not discussed or distinguished by the majority opinion.

*Jones v. Gibbs* is an often cited case dealing with equitable relief, and it supports the judgment of the trial court in this case. The majority opinion summarily rejects this valid case law by finding that the facts in *Gibbs* were only "slightly contested" while the facts in this case were "strongly contested." *Jones v. Gibbs*, 133 Tex. 627, 130 S.W.2d 265 (1939). It is of no concern to an appellate court whether the facts are "slightly contested" or "strongly contested," because it is the sole province of the jury to resolve these factual disputes regardless of the degree to which they are contested. A court of appeals cannot step into the shoes of a jury and replace their judgment with its own. *Lofton*

*v. Texas Brine Corp.,* 777 S.W.2d 384, 387 (Tex.1989); *St. Paul Medical Center v. Cecil,* 842 S.W.2d 808, 813 (Tex.App.—Dallas 1992, no writ).

In many instances the majority opinion rejects the jury's resolution of the disputed facts, finds the facts to the contrary, and ignores existing case law in order to reverse the judgment of the jury. This is not the function of an appellate court. If there is more than a scintilla of evidence supporting the findings of the jury, they must be affirmed. *County of Burleson v. General Electric Capital Corp.,* 831 S.W.2d 54, 57 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

I believe the facts show, and the jury found, that any failure to timely exercise the option by Appellees was caused by the acts and misrepresentations of Appellants. Further, these acts and misrepresentations were designed to make exercising the option impossible. By their verdict, the jury found that Appellants never intended to accept "reasonable compliance", and never intended to allow the option to be exercised. For example, Appellants complain that Appellees defaulted because a Federal lien attached to the property for taxes due. However, evidence showed that the lien was filed because appellants failed to pay income taxes due on rental income received by Zu.

Although there were several instances of the intent of Appellants' to prevent Appellees' from exercising the option, I believe the attorney for Appellants made their intent crystal clear. The closing was scheduled for 3 p.m. and Appellants' attorney did not arrive until after 5 p.m. All banking establishments were closed by that time, as was the Harris County District Clerk's Office. Appellants attorney then refused to accept a cashier's check and claimed the agreement requirements of *cash* meant "greenbacks", or "coins of the realm." If Appellants' attorney had been on time, the cashiers check could have been exchanged for *cash* at any bank before 5 p.m. This rejection was unreasonable. Also, Appellants' attorney refused to accept the court order releasing the Gentry Lien because the order was not "recorded." However, if the closing had been held at 3 p.m. as scheduled, the release could have been recorded before the clerks' office closed. This rejection was also unreasonable. Both acts constitute breaches of the agreement by Appellants.

The jury found that Appellees' failure to "timely" exercise the purchase option was excused due to the wrongful acts and breach of contract by Appellants. This is the correct result and is supported by solid Texas law. When one party to a contract impedes the performance of the other, the failure to perform by the other party cannot be used by the wrongdoer to defeat performance of the contract. *See Citizens National Bank v. Vitt,* 367 F.2d 541 (5th Cir.1966).

The majority opinion holds that the doctrine of forfeiture should not be applied to disputes arising out of option agreements. Apparently, the majority opinion holds that equity cannot apply to an option agreement. The majority cites a no writ El Paso case which holds that "an option contract does not come within the equitable rule against forfeiture since failure to comply strictly with the conditions of the option deprives no party of any right and abrogates no contract." *See B.F. Saul Real Estate Inv. Trust v. McGovern,* 683 S.W.2d 531, 534 (Tex.App.—El Paso 1984, no writ). The problem with reliance on this case is that the *McGovern* case is a suit for liquidated damages provided for in a loan commitment agreement. It is not a "classic option agreement." Further, the lender in *McGovern* did not breach any provision of the agreement and the borrower failed to put on any evidence. In this appeal, the Appellees presented the jury with an abundance of evidence showing that Appellants' breached several provisions of the agreement. The El Paso Court found the loan commitment to be a unilateral contract because "the lender cannot be forced to do anything." As shown below in this dissent, the Appellants' herein were required to perform many acts. I find the majority reliance on this authority inapposite.

The fact that this option agreement is only one of 37 documents executed by the parties in compromise and settlement of all disputes between them should clearly remove it from the "classic option agreement." Also, this

agreement, unlike the one in *McGovern*, requires certain acts and conditions to be met and/or performed by the Appellants. First and foremost, it requires Appellants to accept Appellees performance if it is "reasonable." See paragraph 4d of the Stock Purchase Agreement. Paragraph 6b prohibits CESA conveyance of any "security interest or ownership interest in the stock of Zu Corporation, 3113 Bering Corporation and Northland Corporation, or the bulk assets of those corporations." In the same paragraph, CESA agrees that it will "undertake to prevent Zu Corporation and 3113 Bering Corporation from conveying or mortgaging the Land.: CESA further agrees to prevent Zu, 3114 Bering, and SRD Vending Inc. from authorizing or issuing any additional stock or in any way diminishing or diluting their value. In paragraph 6c, CESA obligates itself to acquire "any outstanding shares of Northland Corporation owned by Salah Izzedin." CESA agrees in paragraph 6e to prevent Zu, 3113 Bering and Northland from making payments of certain "actual or constructive dividends", and in 6f to "cause Northland Corporation not to enter into leases that would be injurious to the business of Trumps, Inc."

Paragraph 6d of the Stock Option Agreement is the most obvious evidence of a bilateral agreement, and evidence that other agreements between the parties cannot be excluded from this agreement in an attempt to claim it is a unilateral contract. Paragraph 6d provides:

> During the term of this Agreement, CESA will undertake to require Zu Corporation, 3113 Bering Corporation and Northland Corporation to perform their obligations under any agreements in which they are lessors or landlords. This includes, without limitation, the obligation of Northland Corporation to keep taxes current on any property owned by it. CESA will undertake to require Northland to perform its obligations to W. Bell and Co. under their subleases, and CESA will undertake to provide Fontenot and Watters with notice and an opportunity to cure any defaults on Northland's obligations to W. Bell and Co. If Fontenot and Watters cure any defaults to W. Bell and Co., they will be entitled to

an offset for amounts actually paid to W. Bell and Co. to cure default of Northland against the obligations of Trumps on the lease.

It is clear that the option agreement requires CESA to complete certain acts and prohibits them from performing other acts. Further, under the provisions of this agreement, CESA obligates itself to compel at least three other corporations to do, and refrain from doing, certain things.

In conclusion, I find the Stock Option Agreement to be a bilateral agreement and would affirm the findings of the jury and the judgment of the trial court.